545 A.2d 1281

**Al Wayne DOERING**

v.

**STATE of Maryland.**

**No. 113, Sept. Term, 1987.**

Court of Appeals of Maryland.

Aug. 25, 1988.

386

Melissa M. Moore and George E. Burns, Jr., Asst. Public Defenders (Alan H. Murrell, Public Defender, all on brief), Baltimore, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Cathleen C. Brockmeyer, Asst. Atty. Gen., all on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

McAULIFFE, Judge.

Al Wayne Doering appeals from his convictions of murder in the first degree, robbery, burglary, and related offenses, and from a sentence of death. We shall affirm the convictions but vacate the sentence and remand the case for a new sentencing proceeding.

I

*Facts*

At about 1:00 a.m. on October 3, 1986, Doering and David Reinhardt, dressed in camouflage clothing and armed with knives and rifles, broke into the home of Harry Riepe, located on Jones Road in Baltimore County.[1] Mr. Riepe, who was 89 years of age, lived alone in the two and one-half story home, which, together with its surrounding 110 acres, was known as Mt. Peru Farm. After searching the first floor of the home and gathering any valuables they wished to steal, Doering and Reinhardt proceeded to the second floor to search for additional valuables, and apparently to search for the "old man" they knew lived there. Under circumstances which will be more fully described as we

---

1. The evidence disclosed that Doering and Reinhardt had also broken into the Riepe home several days before the murder, on September 28. Charges for this offense were included in the indictment, and Doering was found guilty of daytime housebreaking in connection with this earlier incident.

discuss the sufficiency of the evidence to show premeditation, they confronted the victim, and Doering killed him with a single shot from the .30–.30 rifle he was carrying. They then gathered additional property and left, returning to a bus in which they both lived at the time, and which was parked in an area containing discarded construction equipment approximately one-quarter to one-half mile from the Riepe home.

At about 7:30 that morning, Brandon Moffett visited Doering at the bus, apparently to see Doering's collection of guns. Doering told Moffett that he had shot and killed an old man. Doering then took Moffett to the Riepe home, so that Moffett could view the scene. As they were leaving the home, but were still in the driveway which led from the residence to Jones Road, they were seen by Mary Holt, granddaughter-in-law of the victim.[2] Mrs. Holt lived nearby, and had driven by her grandfather's home on her way to work. She became concerned when she saw two men, whom she described as white males, very dirty, with greasy hair, wearing blue jeans and dark shirts, both wearing glasses, and one or both carrying knives in sheaths on their belts.[3] After passing them, Mrs. Holt observed in her rear view mirror that they walked slowly out of the driveway and a short distance away from her on Jones Road, after which they stopped and turned to look at her car. She stopped, backed into the driveway to get a better look at them, and then returned to her home to report to her husband what she had seen. Mr. Holt took his wife back to the scene, and then to a nearby parking area, a truck stop, and a bar, in an unsuccessful attempt to locate the individu-

---

2. For convenience, we sometimes hereafter refer to Mrs. Holt and Mr. Riepe as granddaughter and grandfather.

3. Mrs. Holt was aware that her grandfather's home had been broken into a few days earlier, and that the perpetrators had slashed the roof liner and seats of Mr. Riepe's automobile, pulled stuffing from the seats, and damaged the dashboard. Following that incident, she and her husband had attempted to keep a close watch over the Riepe property, while arranging for the installation of an alarm system.

als she had seen. He then returned to his home, and, when he was unable to reach his grandfather by telephone, reported what had transpired to the police. He then went to his grandfather's home, where he met the police and discovered that his grandfather had been shot and killed.

In response to a police broadcast relating the homicide and giving Mrs. Holt's description of the two men who had been seen acting suspiciously on the victim's property, Lieutenant Nugent and Corporal Foracappa of the Baltimore County Police Department began a search of the area. While searching sheds in the nearby Gunpowder Business Park, the officers were told by a manager or proprietor of the park that there were a couple of people living in a bus in a wooded area to the rear of the park. That individual also advised the police that "they were shooting back there often and to be careful if [you go] back there." The officers drove on an unpaved road which led from Jones Road, through an area of discarded construction equipment on a lot owned by B & B Construction Company, to a point just short of the location of the bus. Approaching on foot, they observed near the bus two men who fit the description given earlier by Mrs. Holt. As they approached with their service revolvers drawn, both officers noted shell casings on the ground, some of which Lieutenant Nugent described as not being tarnished, indicating that weapons had recently been fired there. Additionally, Lieutenant Nugent observed a third person entering the bus and closing the door behind him, and Corporal Foracappo saw the bus door close, although he did not see anyone enter the bus. The bus was described as a small, 30–foot school bus, apparently converted for use as a mobile home or camper.

Moffett, who had been standing next to a bicycle at the front of the bus, and Doering, who had been seated on a stack of old tires more to the side of the bus, were directed to place their hands on the front of the bus, and were subjected to a pat-down search for weapons. A bayonet knife and buck knife were taken from Moffett and a buck knife and three shotgun shells were taken from Doering.

The officers then asked Moffett and Doering who had gotten onto the bus, and were told "no one." Although the officers told them that they had seen the door close behind someone, Moffett and Doering again denied there was anyone else on the bus. The officers then called out instructions to anyone on the bus to come out, but there was no response. Then, after either Doering or Moffett said "come on out, Dave," Reinhardt exited the bus.

After Reinhardt had been patted down for weapons, the officers asked who owned the bus, and were told by Reinhardt or Doering that they lived on the bus. The officers again inquired as to whether anyone else was on the bus, and were told by Reinhardt to "go check for yourselves." Lieutenant Nugent entered the bus, which he found to be very dark because the windows were covered, and called out to anyone who might be inside. Receiving no reply, he took one or two steps and encountered a rifle. Backing out of the bus with the rifle, he found it was loaded, with a round in the chamber. After removing the bullets from the rifle, Lieutenant Nugent again entered the bus and called out to any possible occupants. Again, receiving no reply, he allowed his eyes to adjust to the dim light, and then observed "weapons everywhere," including rifles, shotguns, swords, knives, and bayonets. He removed the rifles and shotguns from the front area of the bus, finding all but two of them to be loaded. He could not see beyond, and did not go past, a curtain that concealed the rear portion of the bus. As Lieutenant Nugent explained it, he intended to call in police dogs to search beyond the curtain, but "I got as many weapons as I could reach and made them all safe."

Shortly thereafter, other police officers brought Mrs. Holt to the bus, and she identified Doering and Moffett as the two men she had seen on her grandfather's property earlier that morning. Moffett, Doering, and Reinhardt were then placed under arrest, advised of their rights, and taken to police headquarters, where Doering made a full confession.

Doering elected a court trial on the issue of guilt or innocence, and was found guilty of first degree murder, robbery, burglary, and related offenses. He elected a jury trial on the issue of punishment for the murder, and the jury found the appropriate sentence to be death. An appeal was taken to this Court in accordance with Maryland Rule 898 and Article 27, § 414 of the Code (1957, 1987 Repl.Vol.).

## II

### *Suppression of Evidence*

Doering contends that the evidence relating to the guns taken from the bus by Lieutenant Nugent should have been suppressed as the product of an illegal search and seizure, and that evidence of his confession should have been suppressed because it was the product of an illegal arrest. We divide these contentions into three parts, and discuss each separately.

## A

### *Entry onto the Land*

Doering contends that because he made his home in the bus, and because the police came within the curtilage of his "home" without his permission, any search or seizure that followed was in violation of the Fourth Amendment. He is wrong for several reasons. First, as we shall discuss more fully in Part II–B, we find that under all the circumstances of this case the bus was properly treated as a vehicle for purposes of the Fourth Amendment, and thus it had no curtilage. Second, even assuming that the bus had sufficient characteristics of a residence to justify consideration of the curtilage concept,[4] there was no definable curtilage in this case. The bus was on, and at the terminus of,

---

4. *See United States v. Dunn,* 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987); *California v. Ciraolo,* 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986); *Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984); *Everhart v. State,* 274 Md. 459, 483–86, 337 A.2d 100 (1975).

an unpaved road that traversed the B & B Construction Company lot. There was no enclosure of any kind, nor any other physical characteristics that could signal the existence of a discrete area contiguous to the bus and reserved for adjunct residential use. Doering seems to suggest that the entire B & B lot must be treated as curtilage to the bus, but offers neither legal nor factual justification for that rather extraordinary proposition. Finally, even if we assume that Doering was within the protected curtilage when the police approached, we find no violation of Fourth Amendment protections. The police entered the property by way of a private road from a public street, in the course of a legitimate investigation of a serious crime. They encountered no obstacles or warnings as they entered, and under these circumstances we find that they had a right to be there. As the Oregon Court of Appeals said in *State v. Corbett*, 15 Or.App. 470, 516 P.2d 487, 490 (1983), "[c]riminal investigation is as legitimate a societal purpose as is census taking or mail delivery." *See also Brown v. State*, 75 Md.App. 22, 540 A.2d 143 (1988). *See generally* 1 LaFave, *Search and Seizure*, § 2.3(f) (1987).

The concept of a reasonable expectation of privacy in a particular place is not simplistically singular. It involves, instead, a bundle of privacy interests. One who closes the door to a glass telephone booth may have a reasonable expectation of privacy as to what he is about to say, but no reasonable expectation that the number he dials may not be seen by a casual observer outside the booth. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Similarly, one may have a legitimate expectation that police officers will not conduct a warrantless intrusive search of the curtilage to his home, but have no reasonable expectation that police officers will not simply enter a portion of that curtilage in the course of an investigation. Doering enjoyed no constitutionally reasonable expectation that police officers would be excluded from the place where they confronted him.

B

## Search of the Bus

The State contends that the warrantless entry into the bus, and the seizure of weapons from within it, were justified on two bases: 1) a limited intrusion of a vehicle reasonably required for the protection of the investigating officers, and 2) a consent search. The State eschews reliance upon the automobile exception established by *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

Petitioner argues that under the circumstances here present the bus must be considered a dwelling, and that there was no showing of an exigency sufficient to justify the warrantless entry into a home. Concerning the issue of consent, he does not deny that the officer was invited to enter the bus. Rather, he contends that the consent was not voluntarily given, but was a response to a threat of force.

The first justification for the search advanced by the State is grounded upon the exception recognized in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). There, the Supreme Court recognized that certain on-the-spot police activity cannot be subject to the warrant procedure, but instead must be tested against the Fourth Amendment's general proscription against unreasonable searches and seizures. Recognizing that "a perfectly reasonable apprehension of danger may arise long before the officer is possessed of adequate information to justify taking a person into custody for the purpose of prosecuting him for a crime," 392 U.S. at 26–27, 88 S.Ct. at 1882–83, the Court held that where specific and articulable facts and the inferences fairly deducible therefrom would warrant a person of reasonable caution in the belief that a search for weapons should be conducted, and the search is reasonably related in scope to the circumstances which justified the intrusion in the first place, a warrantless search may be reasonable.

*Terry* involved a pat-down of the person, but subsequent cases have made it clear that legitimate state interests in police safety may justify other types of intrusion. In *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), the Court held that once a motor vehicle has been lawfully detained for a traffic violation, the police may order the driver out of the vehicle without violating the Fourth Amendment. The Court reasoned that a legitimate concern for the safety of the officer outweighed the minor inconvenience to the driver, and thus the action was reasonable. In *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Court upheld as reasonable the action of a police officer in reaching into a vehicle and removing a gun from the occupant's waistband, where the officer was conducting a legitimate investigation, the surrounding circumstances gave him ample reason to fear for his safety, and he had received information that the person he was investigating was carrying a loaded weapon at his waist. In *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the Supreme Court held that a limited *Terry* -type search could extend beyond the person of the suspect, and into the passenger compartment of a motor vehicle, if a reasonably prudent person in the position of the officer would have entertained an articulable suspicion that the protective search was reasonably necessary to neutralize the threat of physical harm. Borrowing from *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), and *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), the Court held that

the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons. (footnote omit-

ted). *Michigan v. Long, supra,* 463 U.S. at 1049, 103 S.Ct. at 3481.

The Court made clear that not every investigative stop of an automobile will justify a search of the passenger compartment for weapons, but that the level of suspicion identified in *Terry* must be present. *Id.* at 1049–50, n. 14, 103 S.Ct. at 3481, n. 14.

■■■ Although the *Belton* concept engrafted upon *Terry*-type searches provides a bright-line rule for determining the permitted area of a limited search of a motor vehicle for weapons, the more difficult question of when such a search is reasonable within the meaning of the Fourth Amendment necessarily requires a careful balancing of interests under the particular facts of each case. The justification for the intrusion must be balanced against the character of the intrusion. Circumstances that justify a brief "stop" for investigation may not be sufficient to support a "frisk" for weapons. Where the intrusion is minimal, it may be justified by the general knowledge that police officers are statistically at risk in certain situations. *Pennsylvania v. Mimms, supra.* Where the justification is specific and substantial, an intrusion that exceeds an ordinary frisk may be reasonable. *Adams v. Williams, supra.*

■■■ In assessing the gravity of an intrusion, we consider the objective expectation of privacy that reasonably existed, and the extent to which it was invaded. When the expectation of privacy is legitimately high, only the most exigent circumstances will justify a warrantless intrusion. Thus, when the sanctity of the home is involved, the exceptions to the warrant requirement are few. *Thompson v. Louisiana,* 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984); *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984); *Michigan v. Clifford,* 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984). Where a motor vehicle is involved, however, the exceptions are more numerous. This is true not only because the mobility of an automobile tends to create an omnipresent exigency, but also because "the

expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." *South Dakota v. Opperman,* 428 U.S. 364, 367, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976).

Difficulty arises, however, when the distinction between one's home and one's means of transportation becomes blurred. The Supreme Court faced this problem in *California v. Carney,* 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985), a case involving the warrantless search of a motor home parked in a lot in downtown San Diego. Carney argued that because his vehicle was capable of functioning as a home, and because at the time of the search it was being put to a use more consistent with that of a residence than that of a vehicle, he should be afforded the expectation of privacy one would have in his home. The Supreme Court disagreed. Although noting that Carney's vehicle possessed some, if not many, of the attributes of a home, the Court declined to establish categories for Fourth Amendment purposes based upon "the size of the vehicle and the quality of its appointments." 471 U.S. at 393, 105 S.Ct. at 2070. Rather, the Court focused upon the objective picture presented by the facts. A mobile home parked on or near a public road, retaining the indicia of ready mobility, will ordinarily be treated as a vehicle. Although not passing on the issue, the Court suggested that the same mobile home, on blocks and connected to utilities in a mobile home park, would likely qualify for the Fourth Amendment protection afforded a home, because mobility is obviously lacking and the clear objective indications are that the vehicle is being used as a residence.

■ Applying the principles of *Carney* to the facts of this case, we are persuaded that the circumstances justified the officers' treatment of the bus as a vehicle rather than a home for purposes of conducting a limited search for weap-

ons in a portion of the bus.[5]  To the officers, the bus presented the appearance of an instantly mobile vehicle.[6]  It was not on blocks, but rested on its own fully-inflated tires. It was not connected to any utilities, nor was it located in a mobile home park or other similar area.  It was fully equipped with lights, turn signals, mirrors, radio antennas, windshield wipers, and the like.  Its window glass was intact and clean.  It bore Virginia license tags.[7]  It was located on and at the end of an unpaved, but clearly established, roadway which traversed the B & B yard, and which intersected with Jones Road approximately 100 yards to the west.  The bus had been backed into the end of the roadway, so that it pointed toward Jones Road.  Although a dilapidated sofa was located in front of the bus, the sofa readily could have been moved, or the bus could have been backed up a few feet and then driven out to the right of the sofa.  On the other hand, the officers had been told that people were living in the bus, and they could observe that interior curtains had been drawn across the windshield.

We conclude that under these circumstances the officers were not required to view the bus as a home.  Although Doering lived in the bus, his expectation of privacy could be no greater than one who elects to live in his automobile or van.  As the Supreme Court said in *Carney*, the public is fully aware that it is accorded less privacy in its automobiles than in its homes.  471 U.S. at 392, 105 S.Ct. at 2070. Unless the surrounding circumstances indicate that the vehicle has lost its characteristic mobility and is being used exclusively as a residence (as opposed to a combination residence and means of transportation) it is not unreason-

---

**5.**  We express no opinion as to whether Lieutenant Nugent might have extended his search for weapons into the rear portion of the bus, beyond the curtain which served as a partition.

**6.**  We are aided in our understanding of the scene by color photographs of the bus and its immediate environs, which were admitted at the suppression hearing as State's exhibits 1A, 1B, and 1C.

**7.**  These tags had expired, but it is not clear from the record whether the officers were aware of that at the time of entry into the bus.

able to limit the expectation of privacy to that ordinarily associated with a vehicle. A reasonably prudent police officer looking at this bus would have seen a vehicle and not a home. Doering's reasonable expectation of privacy properly may be gauged by the circumstances under which he chose to live.

■ These police officers were investigating a murder by gunshot that had occurred not more than one-quarter to one-half mile from the location of the bus. They had a description of several men who were seen acting in a suspicious manner near the victim's residence less than an hour before. The two men they saw outside the bus exactly fit the description they had been given. They also had been told the men who lived on the bus did a lot of shooting there, and to be careful. They had seen a number of rifle and shotgun shell casings in the immediate area of the bus, some of which were not yet tarnished, indicating that they had been recently fired. As a result of a pat-down search for weapons, they removed a buck knife and three shotgun shells from Doering, and a bayonet knife and buck knife from Moffett.[8] They knew that Moffett and Doering had lied to them about whether anyone else was on the bus, and that Reinhardt had attempted to hide, coming out of the bus only at the request of his friends. The two officers faced a situation fraught with danger. They had no way of knowing whether other persons were on the bus, and they had no confidence in the suspects' statements that no one else was there. They had every reason to believe that there were guns on the bus, not only from what they had been told, but also from what they had observed. They had a right to detain the suspects until the victim's granddaughter could be brought to the scene for a show-up, and yet they were vulnerable to attack by any confederates still on the bus,

---

8. The knives were being carried openly, and their possession did not constitute a violation of the law. Notwithstanding that, the police were entitled to consider the presence of the weapons in assessing the dangerousness of the situation. *Michigan v. Long,* 463 U.S. 1032, 1052 n. 16, 103 S.Ct. 3469, 3482 n. 16, 77 L.Ed.2d 1201 (1983).

and at risk if there were, in fact, guns located in close proximity to the suspects. Under these circumstances, we conclude that a limited search for weapons, conducted in the passenger compartment of the bus, was reasonable. No greater intrusion took place than was necessary under the circumstances. Even if, in retrospect, we could conjure up an alternative method by which the officers could have gained some measure of protection, that would not be decisive. These officers were faced with the need to make a quick decision as to how to protect themselves, and under these circumstances we believe their decision was reasonable. *See Michigan v. Long, supra,* 463 U.S. at 1052, 103 S.Ct. at 3482.

We also conclude that the initial entry into the bus by Lieutenant Nugent may be sustained on the ground of consent. After Reinhardt came out at the urging of his companions, the police inquired of all three suspects whether anyone remained on the bus. Reinhardt answered that there was no one else, and said "go check for yourselves," or words to that effect. Lieutenant Nugent entered the bus and immediately encountered a substantial number of rifles and shotguns, most of them loaded. He removed and unloaded the weapons. He did not find anyone else on the bus, although he declined to search beyond a curtain located near the rear of the bus.

The first question is whether Reinhardt, who was living on the bus and who therefore had authority to consent to the entrance by another into a common area, made the statement attributed to him. Both officers testified that he did, and no one else who was present took the stand to deny that fact, or to suggest that the circumstances under which the statement was made were other than as related by the police. We accept the finding that the statement was made.

The next and more difficult question is whether the consent was voluntary in the constitutional sense. The burden of proving that the consent was freely and voluntarily given is upon the State. *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Bump-*

*er v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968). Consent that is coerced by threats or force, or granted only in submission to a claim of lawful authority, is not voluntary. *Schneckloth v. Bustamonte,* 412 U.S. 218, 233, 93 S.Ct. 2041, 2051, 36 L.Ed.2d 854 (1973). Coercion that defeats voluntariness may be by explicit or implicit means, by implied threat or covert force. 412 U.S. at 228, 93 S.Ct. at 2048. Although custody is a factor to be considered in determining voluntariness, it is not dispositive, and a person in custody may validly consent to a search. *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976).

In the instant case, there was a display of force by the police. At first contact, both officers had their revolvers drawn. Lieutenant Nugent holstered his weapon immediately after Reinhardt emerged from the bus and had been patted down. At the time the statement of consent was made, Corporal Foracappo had his revolver out, but not pointed at anyone. The detention at this point had been relatively brief, and the police had made no threats, nor claimed authority to enter the bus. We think a most important consideration is the fact that the consent was volunteered, and was not given in response to a request by the police. It is difficult to conceive of the consent merely being an acquiescence to the commanding presence of the police when the idea for the search originated with the persons being detained. We conclude that Judge Fader did not err in sustaining the search upon the additional ground of consent.

## C

### *The Confession*

Doering contends that his confession should have been suppressed because it was the product of an illegal arrest. Doering was arrested without a warrant after the granddaughter of the victim positively identified him as one of the two men she had seen acting in a suspicious manner in the victim's driveway that morning. Our initial inquiry is

whether the Baltimore County police had probable cause to believe that a felony had been committed and that Doering had been involved in the commission of the felony. *Sterling v. State,* 248 Md. 240, 244, 235 A.2d 711 (1967). The rule of probable cause is a non-technical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction but more evidence than that which would arouse a mere suspicion. *Sterling,* 248 Md. at 245, 235 A.2d 711; *Edwardsen v. State,* 243 Md. 131, 136, 220 A.2d 547 (1966). As the Supreme Court said in *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949):

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.
>
> \*     \*     \*     \*     \*     \*
>
> Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating ... often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.

▆▆▆ Applying these principles to the aggregate of facts known to the Baltimore County Police Department, we conclude that probable cause existed for the arrest. The circumstances of the shooting death certainly supported the probability that a felony had been committed. Doering and his associates were known to be in possession of numerous rifles and shotguns, and to be in the habit of firing them. Doering was armed with a buck knife and possessed three shotgun shells at the time he was frisked. Doering was

known to the police to have lied in an attempt to prevent the police from learning that Reinhardt was on the bus. Of particular significance was the fact that Doering had been positively identified by the granddaughter of the victim as one of two men who had been seen that morning acting in a suspicious manner on the victim's property. Although the police officers may not have known the particular actions that led the granddaughter to conclude that they were acting suspiciously, they knew that those actions had been sufficient to cause concern on the part of the granddaughter, and to cause a report to be made to the police.

Doering argues that because the bus on which he lived was located in rather close proximity to the victim's home, the police should have concluded that it was not unusual or suspicious for him to be in that area. This argument overlooks the physical realities of the area. The area in which the victim lived, which consisted of a few homes located on very large lots, was separated from the industrial and commercial area where the bus was located by railroad tracks. To anyone familiar with the area, as the police were, Doering's presence in the vicinity of the victim's home hardly could be considered a stroll in his neighborhood. There was no apparent legitimate reason for Doering to have been on the victim's property, as the granddaughter had reported, nor were the police required to ignore the salient fact that the conduct of Doering and his companion in that area was sufficiently alarming to the granddaughter to cause a report of their suspicious activity to be made to the police. A non-technical, common sense evaluation of the totality of the circumstances led the experienced police officers to conclude that it was probable that Doering was involved as a criminal agent in a felony, and the arrest was therefore justified.

## III

### Premeditated Murder

Judge Fader found that Doering was guilty of first degree murder, not only on the ground that the murder had

been committed in the perpetration of a dangerous felony, but also because he found the murder to have been willful, deliberate, and premeditated. Doering challenges the sufficiency of the evidence to support the finding of premeditated murder, claiming that the evidence shows nothing more than an instinctive reaction on his part. Specifically, he says the evidence shows that he was surprised in the course of a burglary by a man wielding a shotgun, and he panicked and shot him. The trial judge saw it somewhat differently, finding ample evidence of premeditation in Doering's own statement. We set forth part of what Doering told the police:

At about 1:00 [a.m., Dave Reinhardt and I] went to the back of the house, cut a hole in the far left window at the top by the latch (lock). Then we pushed open the window, went in and settled down in the kitchen. Settled—waited for about 15 minutes. Then we looked in all the rooms downstairs for anything valuable—that we could carry. When we were done with that, we waited for about 15 minutes in a bedroom by the stairs. When we were sure everything was quiet, we went upstairs. We searched all the bedrooms for valuables, except for the one Mr. Riepe was in. We waited about 20 minutes to make sure he was asleep. Then we went to the front door of his bedroom. There I dropped to my left knee, fired my .30-.30 into the middle of the door. I thought if I could put a large enough hole in the door, I could put my hand through it, and unlock the door, since it was locked from the inside. It didn't work—the .30-.30 slug didn't go through the door. So Dave and I went down the hall to another bedroom on the same side of the house. This bedroom leads into Mr. Riepe's bedroom by a bathroom. All this time Mr. Riepe didn't stir at all. When we got into the "adjoining" bedroom, we sat on the bed for about 20 minutes. Then Dave got down behind a chair, and covered the bathroom with my .243. I got down behind the far side of the bed. We waited about another 20 minutes. Then Dave picked the bathroom door open, (it

was locked from the inside). Then we went back to our former positions and waited about another 10 minutes. By this time it was roughly about 3 a.m. After waiting, I opened up the bathroom door, went inside the bathroom. I moved a wooden towel rack out of my way to get in the bathroom. Dave was behind me with the .243. Mr. Riepe evidently had heard us opening up the bathroom door, because he had opened up his bedroom door. When I got inside the bathroom, I signaled Dave to back off a little, because he was right on my heels. I stood in the bathroom for about 10 minutes. Dave was now standing behind the door, which was partially open. Then Mr. Riepe came out of his bedroom. First I saw a small calibre double-barrell shotgun come out of the bedroom, then I saw Mr. Riepe's head and left shoulder. He was raising the shotgun up to my chest, so I panicked. I brought the .30–.30 up a little, and over (to the left) a little, and then fired the .30–.30. When I fired the .30–.30, I was only about five feet from Mr. Riepe. He spun around, and landed face down.

In a separate written statement, given on the same day to other officers, Doering said:

When Dave and I went upstairs, it was about 1 a.m. October 3, 1986. Time seemed to drag by, but really it took a couple (2–3) minutes from: 1) firing a shot into the front bedroom door, and 2) opening up the bathroom door, and picking off Mr. Riepe.

Doering also admitted he was not under the influence of drugs or alcohol at the time of the murder; that he was familiar with firearms and the mechanics of their operation; and that he did not at any time tell Mr. Riepe to drop his weapon before shooting him.

Far from compelling a finding of surprise and panic, this evidence permitted a finding that Doering and Reinhardt had mercilessly stalked their 89–year-old prey, ultimately finding and killing him. The finding of premeditated murder was fully justified by the evidence.

## IV

### Evidence Relating to Parole

At the sentencing proceeding, Doering sought to place before the jury evidence relating to his eligibility for parole in the event a life sentence was imposed. By means of a letter and an affidavit, he proffered the testimony of Philip G. Dantes, Chairman of the Maryland Parole Commission. According to the proffer, Mr. Dantes was prepared to testify that a person in Doering's circumstances who received a sentence of life imprisonment could not be considered for parole until he had served at least 19 years.[9] The witness was also prepared to testify that parole could not be granted to such a person without the approval of the Governor, and to testify concerning the statutory criteria that the Parole Commission is required to consider in making an advisory recommendation to the Governor. *See* Maryland Code (1957, 1986 Repl.Vol.) Art. 41, § 4–506. Finally, Mr. Dantes would have testified that the parole consideration date would be extended by one-fourth the length of any consecutive sentences Doering might be given for related offenses.

Judge Fader, although sympathetic to Appellant's arguments in favor of the admissibility of this evidence, felt bound to exclude it in its entirety, citing our holdings in *Booth v. State,* 306 Md. 172, 216–18, 507 A.2d 1098 (1986), *sentence vacated on other grounds,* —— U.S. ——, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987); *Bowers v. State,* 306 Md. 120, 151–53, 507 A.2d 1072, *cert. denied,* 497 U.S. 890, 107 S.Ct. 292, 93 L.Ed.2d 265 (1986); *Evans v. State,* 304 Md. 487, 529–530, 499 A.2d 1261 (1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986); *Poole v. State,*

---

9. Article 41, § 4–607(b)(2) of the Maryland Code (1957, 1986 Repl. Vol.) provides that a person sentenced to life imprisonment as a result of a capital sentencing proceeding is not eligible for parole consideration until the person has served 25 years or the equivalent of 25 years when credits that are available to prisoners are considered. Mr. Dantes would have testified that the maximum reduction which could be earned on a 25-year sentence is 6 years.

295 Md. 167, 453 A.2d 1218 (1983); and *Shoemaker v. State*, 228 Md. 462, 180 A.2d 682 (1962). We re-visit our holdings on this issue in those cases as well as in the later case of *Harris v. State*, 312 Md. 225, 250–51, 539 A.2d 637 (1988), to determine whether those precedents, when viewed in light of the foundation upon which they rest and when contrasted with the current policy of this State as announced by the Legislature, should control the result in this case.

*Shoemaker* dealt with the impropriety of a State's Attorney's argument to a jury in a rape case. In urging the jury to convict, the State's Attorney argued that the defendant could be sentenced to as little as eighteen months and no more than twenty years imprisonment, and that the defendant could be released on parole after, and perhaps even before, he had served one-third of his term of imprisonment. In reversing the conviction, our predecessors said:

> The chief vice of the reference in this case to the possibility of parole is that it suggested to the jury that it might in part shift its responsibility for a finding of the defendant's guilt to some other body.... [T]he natural tendency and effect of the statements about parole was to suggest to the members of the jury that they might resolve any question about the defendant's guilt beyond a reasonable doubt with the thought that, even if they made a mistake, no great harm would be done since he might soon be paroled.

*Shoemaker, supra*, 228 Md. at 469, 180 A.2d 682. The Court carefully distinguished cases in which the jury had a function in fixing the penalty and noted that argument concerning parole in those cases "involved no effort to have the jury shift responsibility in case of doubt to someone else." *Id.* The Court then said:

> In the instant case the prosecutor's request (to which the jury acceded) that the death penalty be not imposed, for practical purposes (even though not theoretically), took the case out of the class of cases in which the jury had any function in fixing the penalty.

228 Md. at 473, 180 A.2d 682.

*Poole* likewise dealt with a prosecutor's argument to the jury. Together with other claims of prosecutorial misconduct, the appellant in that case contended that the State's Attorney's argument to the jury, which included reference to the possibility of parole, constituted error. The prosecutor's argument included the following statements:

Is the revolving door jail, parole, jail, parole, jail, parole going to protect you and—.

\* \* \* \* \* \*

Will a life sentence protect us from Mr. Poole? Can you be sure, can you be sure in your own minds that that silver Cadillac won't someday be gliding quietly in the night in someone's residential community again with Mr. Poole in it?

\* \* \* \* \* \*

I think a life sentence in this case would only send Mr. Poole back to Baltimore laughing, laughing at this proceeding, knowing that he only has to bide his time. All he has to do is wait, be a good inmate, do everything he has to do. *Poole, supra,* 295 Md. at 195, 453 A.2d 1218.

We found the argument of the prosecutor improper. In doing so we cited *Shoemaker,* notwithstanding that the principal rationale of *Shoemaker* dealt with the impermissible shifting of responsibility for the decision of guilt or innocence, an issue that was not involved in *Poole.*

*Evans,* like *Poole,* involved the sentencing proceeding in a capital case. Unlike *Poole* or *Shoemaker,* it was the defendant in *Evans* who attempted to place the matter of possible parole before the jury. The defendant did so on the basis that the evidence was relevant to the statutory mitigating circumstance involving future dangerousness. We held that the trial judge had properly rejected the evidence, noting that "one might be likely to engage in criminal activity constituting a threat to those around him whether he is confined in a penal institution or is on parole." *Evans, supra,* 304 Md. at 530, 499 A.2d 1261. *Harris* and *Booth* followed *Evans* in holding that evidence

relating to parole was not relevant to the question of future dangerousness.

We conclude that the basic rationale of *Shoemaker*, entirely correct in its own setting, is not directly applicable to proceedings involving determination of sentence by a jury. This conclusion justifies a fresh look at the issue, and, in our re-appraisal of the relevant factors bearing on that issue, we take into consideration the current policy of the State with respect to the involvement of the capital sentencing jury in matters concerning parole. By the passage of Chapter 237 of the Laws of 1987, we think the Legislature clearly articulated a policy in favor of greater jury involvement in matters of parole where the jury determines the sentence. That Act, codified at Article 27, §§ 412–13 of the Maryland Code (1957, 1987 Repl.Vol.), permits the sentencing authority, when appropriate notice has been given by the State, to determine whether the sentence shall be death, life imprisonment, or life imprisonment without the possibility of parole. Although the Act did not take effect until July 1, 1987, and thus could not have been applied in Doering's case, the shift in policy is apparent from the date of enactment, and may be considered in connection with this related question. *See Anne Arundel County v. Fraternal Order of Anne Arundel Detention Officers*, 313 Md. 98, 543 A.2d 841 (1988) (statute inapplicable by its terms, but legislative policy underlying the statute considered and common law rule modified accordingly).

We also note that Doering's approach to the admissibility of this evidence differs significantly from that taken by defendants seeking the introduction of similar evidence in our earlier cases. The only justification for admission offered in the past was that the evidence had a direct bearing on the issue of future dangerousness—an argument we did not then find persuasive. Doering's argument, which rests on a much broader base, is that evidence relating to parole is material to the question of the appropriateness of a life sentence, and therefore may operate as a mitigating circumstance.

Maryland's death penalty statute is structured to give very broad discretion to the sentencing authority in determining the circumstances that will be deemed relevant to the ultimate question of whether death is the appropriate penalty. We have said that "[i]f the sentencing authority perceives anything relating to the defendant or the crime which causes it to believe that death may not be appropriate, it may treat such factor as a mitigating circumstance and decide that it [is not outweighed by] the aggravating circumstances." *Foster v. State,* 304 Md. 439, 475, 499 A.2d 1236 (1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986). *See also Harris v. State, supra,* 312 Md. at 252, 539 A.2d 637; *Grandison v. State,* 305 Md. 685, 756, 506 A.2d 580, *cert. denied,* 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986). Our statute permits the sentencing authority wide discretion to decline to impose the death penalty, but at the same time it carefully channels and directs the consideration of factors that would permit its imposition. We interpret our statute as being wholly consistent with the principles of *Hitchcock v. Dugger,* —— U.S. ——, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); and *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); and unaffected by the holding of *Franklin v. Lynaugh,* —— U.S. ——, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) which addressed the effects of a more restrictive statute. Moreover, this Court has recently held that the appropriateness of sentences other than death may be considered by the sentencing authority as a mitigating circumstance. *Harris v. State, supra,* 312 Md. at 251–52, 539 A.2d 637.

■ Upon consideration of these various factors, we now conclude that a jury seeking to determine the appropriateness of a life sentence will be aided by information correctly describing the legal and practical effects of such a sentence, and that the existence of an appropriate alternative sentence must certainly be considered a relevant miti-

gating circumstance. We hold, therefore, that where, as here, the defendant in a capital sentencing proceeding seeks to place before the jury relevant and competent information concerning his eligibility for parole in the event a life sentence is imposed, that request should be granted.

We do not suggest that all the evidence proffered by Doering should have been admitted. We do not believe, for example, that Dantes should have been permitted to give a specific computation of a parole eligibility date predicated upon the assumption that the trial judge would impose maximum and consecutive sentences for all related offenses. That computation would involve speculation as to sentences not yet imposed, and perhaps even involve matters of merger, or possible modification of verdicts as a result of post-trial motions. As we have noted, however, the matter never progressed to the point of a determination, or the exercise of discretion, concerning the part or parts of the proffered testimony that might be admitted. The trial judge ruled that no testimony relating to parole eligibility would be admitted, and under the circumstances of this case that was error. We shall vacate the sentence, and remand for a new sentencing proceeding.

V

*Prosecutor's Argument at Sentencing Proceeding*

There is one other matter involving the sentencing proceeding that is deserving of comment. During closing argument, the prosecutor anticipated that Appellant's counsel would argue, as a mitigating circumstance, that Appellant's actions at the time of the murder had been influenced by David Reinhardt. The prosecutor was permitted to argue, over objection, that because the Legislature had established a particular mitigating circumstance for a defendant who had "acted under the substantial duress, domination or provocation of another person" the jury ought not to find as a mitigating circumstance any influence by another person that did not measure up to the

statutory standard. What is difficult to determine from the transcript, is whether the prosecutor presented this argument as a matter of logic, or was arguing as a matter of law that the Legislature having spoken on the subject had thereby eliminated the possiblity of any lesser influence being considered in mitigation. We think it more likely that the argument was based upon logic, and when considered in context with the court's instructions concerning mitigating circumstances, there was not error. We disagree, however, with the State's alternative argument that the statute set the benchmark for mitigating circumstances based upon the influence of another, below which the jury could not go. We emphasize that the enumerated mitigating circumstances in our statute do not establish limitations, and the defendant is free to argue, and each juror is free to find and consider, any other relevant mitigating circumstance.

CONVICTIONS AFFIRMED. DEATH SENTENCE VACATED. CASE REMANDED FOR A NEW SENTENCING PROCEEDING UNDER § 414 OF ARTICLE 27. COSTS TO HBE PAID ONE–HALF BY BALTIMORE COUNTY AND ONE–HALF BY APPELLANT.