807 A.2d 75

**Robert GRAHAM**

v.

**STATE of Maryland.**

**No. 1246, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Sept. 6, 2002.

328

334

Peter F. Rose, Assistant Public Defender, Brian J. Palmer, Law Student Admitted Under Rule 16 (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Devy Patterson Russell, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Patricia Jessamy, State's Attorney for Baltimore City on the brief), Baltimore, for appellant.

Argued before MURPHY, C.J., CHARLES E. MOYLAN, JR., and RAYMOND G. THIEME, JR. (retired, specially assigned), JJ.

MOYLAN, Judge.

Although the transcript of the suppression hearing, which is all we are going to look at on this appeal, is, from the formality of the introductions to the rendition of the judge's ruling, a bare forty pages in length, and although the testimony of a single police officer, which is all we are going to evaluate (and, indeed, all that we, if properly disciplined, are

entitled to evaluate), is confined within seventeen of those pages, the appeal presents us with a bountiful smorgasbord of closely intertwined Fourth Amendment issues.

Involved are such items as 1) determining the proper factual context for appellate review of a suppression ruling; 2) the allocation of the burden of proof with respect to the reasonableness of a warrantless search or seizure; 3) a mere accosting versus an unconstitutional seizure of the person as the context for evaluating a question of subsequent consent; 4) the true Fourth Amendment significance of a "frisk" or pat-down; 5) the required justification for a *Terry*-frisk; 6) the dubious notion of a consensual pat-down; 7) the "fruit of the poisonous tree" doctrine; 8) the attenuation of taint; 9) both the voluntariness and the scope of an ostensibly consensual automobile search; and 10), perhaps most significantly, the pro's and con's of "the field interview" as a constitutional term of art.

Out of this series of interdependent Fourth Amendment sub-analyses, there emerges with unmistakable clarity a picture of a police procedure that is, at least as employed in this case, a wolf in sheep's clothing. The innocuous surface trappings are all those of a mere accosting, something long sanctioned by the Supreme Court as an everyday occurrence that does not even catch the eye of the Fourth Amendment. The underlying reality, however, is a borderline investigative procedure whereby the police seek to enjoy the full Fourth Amendment benefits of both a *Terry*-stop and a *Terry*-frisk without paying the attendant Fourth Amendment dues. Contributing to the camouflaging process is the linguistic recasting of an accosting into something called the "field interview." Behind that reassuring mask, however, frequently lurks what is, in actuality, a stop-and-frisk. A stop-and-frisk by any other name is still a stop-and-frisk.

### The Present Case

The appellant, Robert Graham, was convicted in a non-jury trial in the Circuit Court for Baltimore City of the possession of cocaine with the intent to distribute it. His single appellate

contention is that the trial judge erroneously failed to grant his pretrial motion to suppress the fruits of an unconstitutional search and seizure.

### Selecting the Appropriate Appellate Story Line

Before launching into a statement of background facts, it behooves us to make a conscious decision as to what sort of a drift we want those facts to take. At the very least, we probably have a choice of factual narratives that are 1) State-biased, 2) defense-biased, or 3) neutral. Contrary to the instinctive assumption, "neutral" may be, for most appellate purposes, the least desirable choice. An explanatory observation would seem to be in order.

A perennial problem for appellate lawyers and appellate judges alike is that of constructing an appropriate version of the facts of a case. The subtle problem is that, except for a case that has proceeded on an agreed statement of facts, there is no version of the facts that is necessarily appropriate for all purposes. As with the classic Japanese film "Rashamen," there are almost always widely varying accounts of what happened out there on the street or out there in the forest, and one version is not to be preferred over another until we know the purpose for which the selection must be made. Which version should be pulled from the shelf on a particular occasion depends on what we are going to use it for.

In a criminal case, there are almost always no less than three versions of what happened. Subject only to the limitation that there must be some minimal support by way of admissible evidence, there is 1) an extreme version most favorable to the defendant; 2) an extreme version most favorable to the State; and 3) at some intermediate point between those two extremes, a more likely version of what probably really happened.

Ironically, that third version—the attempt to approximate ultimate truth—is, generally if not universally speaking, not appropriate grist for the appellate mill. It is the subject matter of persuasion, as a matter of fact, and not of produc-

tion, as a matter of law. It is the exclusive province of the fact finders, a province wherein appellate courts do not enter, but only patrol the borders. It is the broad playing field whereon the resolution of factual questions may take unpredictable bounces and where appellate referees do not presume to second-guess those bounces. It is the arena where the fact finders are free to assess credibilities, to weigh evidence, and to feel and to sense what likely happened, as a matter of fact. *Jones v. State,* 343 Md. 448, 465, 682 A.2d 248 (1996).

It was of this more reasonable and more tempered, but sometimes immaterial, version of the facts that we spoke in *Moosavi v. State,* 118 Md.App. 683, 692, 703 A.2d 1302 (1998), reversed on other grounds, *Moosavi v. State,* 355 Md. 651, 736 A.2d 285 (1999):

> *This hypothetical version* of how we would probably have viewed the evidence and of how the trial judge apparently viewed the evidence, of course, *has no appellate significance.* It is, after all, a neutral or intermediate version of the evidence. As such, *it might have interest for an historian but not for an appellate court. It is only the two most slanted versions of the evidence that have operative legal significance for purpose of appellate review.*

(Emphasis supplied).

Appellate concern is, rather, with the two extreme versions—not with the playing field but with the respective end zones, where forfeitures are declared as a matter of law. It is here that even best-case scenarios are sometimes deemed so inadequate, in terms of naked production, as to be disqualified, as a matter of law, from entry onto the fact-finding playing field. That monitoring of legal sufficiency is the only proper function of the legal referees with respect to fact-finding.

Sometimes, depending of course upon the issue, the appellate court and the trial court alike are enjoined to take that extreme version of the facts most slanted in favor of the defendant. Of such a version we also spoke in *Moosavi,* 118 Md.App. at 692, 703 A.2d 1302:

Had the questions in issue been such things as whether the defendant had generated a genuine jury issue, to wit, a *prima facie* case, with respect to, *e.g.*, entrapment, self-defense, or mitigation or whether there had been enough evidence to support a defense-requested jury instruction, the appellate court and the trial judge alike would then have looked to that extreme version of the facts most slanted in favor of the defendant.

See, *e.g.*, *Sparks v. State*, 91 Md.App. 35, 43–44, 603 A.2d 1258 (1992). When a trial judge grants a motion to suppress and the State appeals, it is the extreme version of the facts slanted in favor of the defendant that provides the context for appellate analysis.

The opposite extreme is that which is tilted as far as possible in favor of the State. Although in *Fraidin v. State*, 85 Md.App. 231, 241, 583 A.2d 1065 (1991), we were discussing the standard by which to assess the legal sufficiency of the State's evidence, what we there said about the slant that must be placed on the facts is pertinent to any occasion when an appellate court must employ that version of the facts most favorable to the State.

The appellant's brief and especially his reply brief are almost strident in their outrage at the State's brief for putting a decidedly pro-prosecutorial "spin" or "twist" on evidence which was hotly disputed and subject to arguably diametric interpretations. On the issue of legal sufficiency, however, both the state and the appellant are enjoined to apply just such a "spin." *The slant is required as a matter of law.* Of all possible versions of events that would be permitted a fact finder, it is, of course, the most partial one permitted by logic and law which we adopt when assessing the legal sufficiency of the State's case. *Fact finding impartiality has nothing to do with measuring a prima facie case.*

(Emphasis supplied). Such a narrative tilt is mandatory when reviewing the denial of a motion to suppress.

■ Reviewing a trial judge's decision either to grant or to deny a motion to suppress evidence, we are required to accept, as presumptively true, that version of the evidence, and all inferences that can reasonably be squeezed therefrom, most favorable to the prevailing party. The leading summary of what is properly before a reviewing court on an issue concerning pretrial suppression was made by Judge Karwacki in *In re Tariq A–R–Y*, 347 Md. 484, 488, 701 A.2d 691 (1997):

> In reviewing the denial of a motion to suppress, we look only to the record of the suppression hearing and do not consider the evidence admitted at trial. *Gamble v. State*, 318 Md. 120, 125, 567 A.2d 95, 98 (1989); *Herod v. State*, 311 Md. 288, 290, 534 A.2d 362, 363 (1987); *Trusty v. State*, 308 Md. 658, 670, 521 A.2d 749, 755 (1987).

Even within that limited universe of the suppression hearing, we are yet further restricted in that we may consider only that version of the evidence most favorable to the prevailing party. Judge Karwacki explained:

> We are further limited to considering only that evidence and the inferences therefrom that are most favorable to the prevailing party on the motion, in this instance the State. *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990); *see also Simpler v. State*, 318 Md. 311, 312, 568 A.2d 22, 22 (1990).

*Id.* See also *Ferris v. State*, 355 Md. 356, 368, 735 A.2d 491 (1999). In this case, the motion to suppress was denied, and the prevailing party is the State.

That standard is the one to which appellate review pays lip service. Unfortunately, it is sometimes more honored in the breach than in the observance. When affirming the trial judge, on the one hand, it is easy to follow the prescribed appellate drill. The narrative tilt supports the court's conclusion. In reversing a trial judge, on the other hand, we sometimes let slip into an opinion other "takes" on the evidence that are more supportive of the opinion's bottom line. There is tension between appellate discipline and appellate desire. The goal, however, nonetheless remains to forego any

opinion as to what really happened and to be able instead, depending on the particular issue on the table at the moment, to shift back and forth from one version of the facts to a diametrically different version with Vulcan dispassion.

■ Two witnesses testified at the suppression hearing in this case. Officer Talley testified for the State. The appellant called Daniel Crowder, who had witnessed the entire encounter from across the street. The two versions of the encounter were so variant as if to have been from different planets. The trial judge gave no credit to Daniel Crowder's account. Nor shall we. We shall treat his testimony as utterly non-existent and make no mention of its content. Indeed, although Officer Talley, between direct examination and cross-examination, lapsed into minor discrepancies, we shall accept that version most supportive of the State's position. See *Reynolds v. State*, 130 Md.App. 304, 319 n. 3, 746 A.2d 422 (1999).

Even after giving the State the full benefit of this decided slant,—assuming full credibility of the State's witness, assuming maximum weight given to the State's evidence, utterly discounting the defense witness, and drawing every permitted inference in favor of the State—we nonetheless hold that the State's position cannot be sustained. The facts that we accept for purposes of this analysis, however, are those advanced by the State.

### A Series of Rapidly Unfolding Events

At some unspecified time on October 25, 2000, Officer David Talley of the Western District of the Baltimore City Police Department drove to the 500 block of Carrollton Avenue, where he encountered the appellant, with ultimately incriminating consequences.

### A. An Anonymous Telephone Tip

Officer Talley went to Carrollton Avenue in response to an anonymous telephone tip that a black male was selling controlled dangerous substances in that block. The tip gave a physical description of the alleged seller and further indicated

that he would be leaning on a gray Ford automobile. When Officer Talley arrived on the scene, he observed the appellant, who fit the description and who was leaning on a gray Ford automobile.

The appellant protests that the anonymous tip did not contain sufficient indicia of reliability to justify a *Terry*-stop of the appellant. Although the appellant's position is fully supported by the Supreme Court decision of *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), the contention is moot. The State does not claim that the telephone tip and its essentially innocuous corroboration established a predicate for any Fourth Amendment intrusion. The State treats the subsequent encounter between Officer Talley and the appellant as a mere accosting, something beneath the radar of the Fourth Amendment. Why Officer Talley went to the 500 block of Carrollton Avenue and why he talked to the appellant is a matter of utter immateriality to our analysis.

## B. The Accosting and the Pat–Down

Initially, Officer Talley engaged in what the Supreme Court would characterize as a mere accosting of the appellant or, as the officer characterized it, a "field interview" of the appellant. Almost immediately after accosting the appellant, Officer Talley patted him down for weapons. The significance of that pat-down will be analyzed in some detail later in this opinion. For immediate narrative purposes, it is enough to point out that, in the course of the pat-down, Officer Talley detected no weapons, but did detect a set of keys.

Q . . . Once you saw him leaning on the grey Ford, what did you do?

A I pulled my vehicle up to exit the vehicle to conduct the field interview, since the description did fit him.

Q And when you conducted the field interview, did he give you his name?

A Yes, I think he did. Yes, ma'am.

Q And then what happened after you asked for his name?

A I just asked him a couple of questions. I never seen him around there and I was new to that post. So, he gave me the information. *I asked him can I search him just for weapons. I didn't go in his pockets. I didn't go into his coat or nothing like that. I just checked him.*

Q *So you did a pat down for weapons?*

A *Yes, ma'am.*

Q And then what happened?

A He didn't have no weapons on him, so I finished talking to him. *I asked him whose vehicle it was. He said it was some guy's up the street.* So I asked him why was he leaning on it. And he was like, he was just leaning, just chilling, just hanging out.

(Emphasis supplied)

## C. The Car Search

The immediately ensuing conversation did not concern the gray Ford as such but the keys that had been discovered, in the course of the pat-down, in the appellant's pocket. Officer Talley asked whose keys they were; the appellant acknowledged that they were his. Officer Talley asked if they would fit the vehicle; the appellant replied that they would not. Officer Talley asked if he might try the keys on the vehicle; the appellant agreed that he might try. Officer Talley opened the car door and discovered "a large amount of money on the floorboard."

Q And did there come a time when you asked him for the keys to the car?

A Yes. I asked him, the keys in his pocket. I asked him whose keys, I mean, when I asked him whose keys in his pocket, he said they mine. I said do they fit the vehicle. He was like no, they don't fit the vehicle.

Q And once he said they don't fit the vehicle, what did you do?

A *I asked him do you mind if I try. He was like sure, go ahead, they're not going to fit. So that's when he hands me*

*the keys out his pocket.* I told him to have a seat on the steps, and I opened the door on the driver's right side.

Q On the driver's side of the car?

A The driver's side.

Q And, just getting to the point here, once you did that—

A I seen—

Q You saw money in the car?

A A large amount of money on the floorboard.

(Emphasis supplied).

## D. The Search of the Trunk and the Arrest of the Appellant

After Officer Talley discovered the "large amount of money" lying "on the floorboard" of the gray Ford, he proceeded to search the entire car. Using the appellant's key, he opened the trunk. Inside a gym bag lying in the trunk, the officer found sixty-seven vials of what turned out to be cocaine. At that point, the appellant jumped up and attempted to run away. He was caught and immediately arrested.

Q And then what did you do?

A I continued to check the vehicle. That's when I went to the trunk. I checked that. And when I opened the trunk it was, I think it was a Charley Rudo locker room bag in there. I picked the bag up and I seen the drugs. That's when he took off running.

## The Narrow Focus of Our Inquiry

Our focus on this appeal is narrow. Just as we were unconcerned with whatever it was that brought Office Talley into contact with the appellant on October 25, 2000, we are similarly unconcerned with everything that happened after Officer Talley spotted the large amount of money on the floorboard. If that observation was constitutionally flawed, everything that followed from it was tainted.

If, on the other hand, that observation was reasonable, the officer had probable cause for a warrantless *Carroll*–Doctrine search of the entire automobile, including both the trunk and the gym bag in the trunk. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Wyoming v. Houghton,* 526 U.S. 295, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999). At that point, whether the appellant was subject to a Fourth Amendment detention or was free to leave was no longer material. Whether the search of the trunk and the search of the gym bag were consensual or non-consensual was equally immaterial.

Our exclusive concern is with the events that transpired in the several minutes beginning with Officer Talley's pat-down of the appellant and ending with Officer Talley's opening of the driver's door and looking into the gray Ford.

### The State's Burden to Rebut The Presumption of an Unreasonable Search

At the threshold, the State now claims that the appellant is raising four or five challenges to the warrantless search of the appellant's automobile and that most of those challenges, not having been expressly argued below, have not been preserved for appellate review. The State misperceives the single, but embracive, issue that was indisputably raised and is indisputably before us.

■ The automobile search that produced the evidence that was the subject of the suppression motion was warrantless. There was, to be sure, an initial burden on the appellant to challenge the evidence and to go forward in offering support for that challenge. In *Herbert v. State,* 136 Md.App. 458, 481–82, 766 A.2d 190 (2001), this Court explained that initial burden:

> As a general rule, the moving party on any proposition, civil or criminal, has both the burden of production and the burden of persuasion. It is the moving party who attempts to persuade a judge somehow to alter the *status quo.*

In a criminal trial, the *status quo*—the norm—is that evidence of a defendant's guilt that is relevant, material, and competent will be admitted. It is the defendant who seeks to alter that *status quo*—who seeks a departure from that norm—when he seeks to exclude relevant, material, and competent evidence of guilt in order to serve some extrinsic purpose, such as deterring the police from future unreasonable searches and seizures. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). To the moving party is allocated the burden of making the case for such an alteration of the *status quo*—for such a departure from the norm.

■ Once it was established, however, that the search in issue was warrantless, the burden shifted to the State to justify the warrantless search. If there were three or four indispensable links in that chain of justification, it was the State's burden to forge each of those necessary links, regardless of whether the appellant was expressly pointing to a particular link. It was of just such a chain of justification that this Court spoke in *Alfred v. State,* 61 Md.App. 647, 652, 487 A.2d 1228 (1985):

> The seizure of these two items of stolen jewelry hangs by a chain of justification consisting of five separate links, no one of which is more than modestly adequate and several of which are structurally flawed to the constitutional breaking point. To support its ultimate burden, the State must establish the sustaining adequacy of each of five propositions.

With respect to 1) the quantitative burden of persuasion at a suppression hearing and 2) the shifting allocation of both the burden of production and the burden of persuasion, this Court clearly described those procedural incidents in *Duncan and Smith v. State,* 27 Md.App. 302, 304, 340 A.2d 722 (1975):

> We are not here concerned with the question of what is the appropriate burden of proof at a suppression hearing once a justiciable issue is properly before the hearing judge. It was settled by *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), that that burden is a preponder-

ance of the evidence. Nor are we concerned with the allocation of the burden of going forward with the evidence on the merits of a search and seizure question. *It is clear that that burden shifts, depending on the presence or absence of a search warrant.*

(Emphasis supplied).

*Herbert v. State* also commented, 136 Md.App. at 485, 766 A.2d 190, on this shifting of the burdens of proof:

Although the initial burden of production (of going forward) is always on the defendant, *there are circumstances* with respect to the Fourth Amendment merits *which,* if established, *may trigger an evidentiary presumption that operates to shift the burdens of both production and persuasion.* The very possibility of such a shift is a direct consequence of the Supreme Court's strong preference for searches and seizures pursuant to judicially approved warrants over warrantless searches and seizures.

(Emphasis supplied).

The shifting allocation of both burdens of proof reflects the strong preference of the Supreme Court for search warrants over warrantless searches. By way of "putting its money where its mouth is," the Supreme Court has backed up that preference by identifying, in those respective postures, the winner and the loser of the tie. When the search is with a warrant, there is a heavy burden on the defendant to rebut the presumption of the search's validity. If the evidence is equivocal, the defendant, having failed to carry that burden, loses. In *Duncan and Smith,* 27 Md.App. at 304–05, 340 A.2d 722, we further explained:

When the police execute a search under authority of a facially adequate warrant, it is presumptively good and the burden is upon the defendant to establish its invalidity. *Where the evidence is inconclusive in this regard, the State wins. United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Alderman v. United*

*States, supra; Hignut v. State,* 17 Md.App. 399, 408–410, 303 A.2d 173.

(Emphasis supplied). See also *Jones v. State,* 139 Md.App. 212, 225–26, 775 A.2d 421 (2001); *Cherry v. State,* 86 Md.App. 234, 240, 586 A.2d 70 (1991).

█ When the State's investigation, for whatever reason, follows the disfavored warrantless route, on the other hand, the procedural ball ends up in the State's court. The State assumes the burden of overcoming the presumption of invalidity by demonstrating, by however many steps are necessary, that the warrantless search satisfied one of the firmly established exceptions to the warrant requirement. In such a posture, it is the State that loses the tie. Again, *Duncan and Smith,* 27 Md.App. at 305, 340 A.2d 722, was clear:

> Where, on the other hand, the defendant establishes initially that the police proceeded warrantlessly, the burden shifts to the State to establish that strong justification existed for proceeding under one of the "jealously and carefully drawn" exceptions to the warrant requirement. *Jones v. United States,* 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514, 1519 (1958). *Where the evidence is inconclusive in this regard, the defendant wins. Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 29 L.Ed.2d 564, 576 (1971); *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576, 585 (1967); *United States v. Jeffers,* 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59, 64 (1951); *McDonald v. United States,* 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948).

(Emphasis supplied).

*Herbert v. State,* 136 Md.App. at 486, 766 A.2d 190, explained this procedural phenomenon of shifting incentives and disincentives:

> Over the course of decades, the Supreme Court has not been content to deliver to American prosecutors and American police a schoolmarmish civics lesson or lecture on investigative restraint. It has, in an exercise of shrewd practicality, provided prosecutors and police with significant

incentives for searching and seizing via the favored or preferred modality, to wit, with judicially issued warrants. Conversely, it has strewn the field with at times vexing disincentives for operating in the disfavored or non-preferred modality, to wit, warrantlessly.

By way of refuting the State's claim of non-preservation in this case, all the appellant had to do was to get the ball into the State's court. That he did. The burden of justifying the warrantless search was on the State.

### Our Ultimate Concern

Our ultimate concern is the constitutional propriety of the police search of the appellant's gray Ford automobile. That search was not authorized by a judicially issued search and seizure warrant. For it to have been constitutional, therefore, it must have qualified under one of the firmly established exceptions to the warrant requirement. It is undisputed that it was not a *Carroll*–Doctrine automobile search based on probable cause to believe that contraband or other evidence of crime was to be found in the car.

█ If the search were to be deemed reasonable, it would have to have been predicated on the appellant's having voluntarily consented to it. The suppression hearing judge ruled that there had been such voluntary consent. Although we accept as the first-level facts in this case that version of them most favorable to the State's position—what the officer did, what the officer asked, what the appellant responded—such ultimate questions as 1) the voluntariness of the ostensible consent and 2), even if voluntary, the actual scope of that consent are second-level, conclusory, constitutional facts with respect to which we must make our own *de novo* determinations.

█ A critical factor bearing on voluntariness is the legal status of the appellant as of the moment the consent was requested and ostensibly given. If the appellant either 1) was not subject to any Fourth Amendment detention of his person or 2) was subject to lawful detention, the voluntariness stan-

dard of *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), would apply. *Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). If, on the other hand, the appellant was being subjected to unlawful restraint, the ostensible consent would be the tainted fruit of that Fourth Amendment violation. *United States v. Mendenhall,* 446 U.S. 544, 558, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) ("Because the search of the respondent's person was not preceded by an impermissible seizure of her person, it cannot be contended that her apparent consent to the subsequent search was infected by an unlawful detention."); *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Ferris v. State,* 355 Md. 356, 373–84, 735 A.2d 491 (1999). The circumstances surrounding and preceding the ostensible granting of consent, therefore, loom large in our analysis.

### The Burden of Proof With Respect to Consent

The allocation of the burden of proof with respect to a consensual search is clear. The Supreme Court spelled it out unequivocally in *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968):

> When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given.

See also *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Schneckloth v. Bustamonte,* 412 U.S. at 222, 93 S.Ct. 2041; *Doering v. State,* 313 Md. 384, 401–02, 545 A.2d 1281 (1988); *Whitman v. State,* 25 Md.App. 428, 435–40, 336 A.2d 515 (1975). *Schneckloth* was also clear that consent searches must not be approved without "the most careful scrutiny."

> "The problem of reconciling the recognized legitimacy of consent searches with the requirement that they be free from any aspect of official coercion cannot be resolved by any infallible touchstone. To approve such searches without

the most careful scrutiny would sanction the possibility of official coercion."

412 U.S. at 229, 93 S.Ct. 2041.

Because the facts available to us concerning precisely what the request for consent consisted of and precisely what the appellant's response was are painfully skimpy, it is doubly important for us to keep this allocation of the burden of proof in the forefront of our minds. Even if we could know everything that happened, the problem appears to be that not much happened. The "most careful scrutiny" may not be possible.

It may be, therefore, the allocation of the burden of proof to which we of necessity must turn to settle a case of otherwise irresolvable doubt. If for our *de novo* determination, the first-level facts do not yield an unambiguous conclusion, is it then the case that it was the State's burden to prove a voluntary consent or was it the appellant's burden to prove the absence of a voluntary consent? It was, of course, the former, and a nothing-to-nothing tie on this question (or a tie at any other level) must go to the appellant.

### The Encounter Began As a Mere Accosting

 By way of our *de novo* determination, we are satisfied that the encounter between Officer Talley and the appellant began as a mere accosting. Spotting the appellant "leaning on the gray Ford," Officer Talley pulled his vehicle to a stop and got out. He asked the appellant his name and the appellant gave it. The merely conversational phase of the encounter that followed was brief and, thus far, uneventful.

Q And then what happened after you asked for his name?

A I just asked him a couple of questions. I never seen him around there and I was new to that post. So, he gave me the information.

With respect to that brief prelude, the observations of Judge Raker in *Ferris v. State*, 355 Md. 356, 374–75, 735 A.2d 491 (1999), are reassuringly controlling:

*Mere police questioning does not constitute a seizure.* This is so even if the police lack any suspicion, reasonable or otherwise, that an individual has committed a crime or is involved in criminal activity, because the Fourth Amendment simply does not apply. *If the engagement between the Petitioner and the officer was merely a "consensual encounter," no privacy interests were invaded and thus the Fourth Amendment is not implicated.* Even when the officers have no basis for suspecting criminal involvement, they may generally ask questions of an individual "so long as the police do not convey a message that compliance with their request is required."

(Emphasis supplied). As of that point in the encounter, the Fourth Amendment was not involved.

### A Frisk or Pat Down Is a Fourth Amendment Intrusion

With the very next question, however, the climate of the encounter took a dramatic turn, as did the attention of the Fourth Amendment.

A ... I asked him can I search him just for weapons. I didn't go in his pockets. I didn't go into his coat or nothing like that. I just checked him.

Q So you did a pat down for weapons?

A Yes, ma'am.

The State, as if skating on thin ice, glides blithely over that sudden change in the constitutional weather. In appellate brief and in oral argument, it seeks to dismiss the frisk as a passing triviality, stressing that it "did not go into [the appellant's] pockets and did not go into his coat." No proper *Terry*-frisk, of course, ever does go into coats or pockets, but *Terry*-frisks nonetheless come most definitely under the careful scrutiny of the Fourth Amendment.

A *Terry*-frisk is not, like a mere accosting, something beyond the pale of Fourth Amendment notice. Labeling it, moreover, a "pat-down" instead of a "frisk" does not shield it from Fourth Amendment review; the two words refer to precisely the same conduct. Indeed, the frisk in *Terry v.*

*Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the very frisk that gave birth to this now extensive body of Fourth Amendment law was no more intensive than the frisk so trivialized by the State in this case:

> *Officer McFadden patted down the outer clothing* of petitioner and his two companions. *He did not place his hands in their pockets* or under the outer surface of their garments until he had felt weapons, and then he merely reached for and removed the guns. *He never did invade Katz' person beyond the outer surfaces of his clothes,* since he discovered nothing in his pat-down which might have been a weapon. Officer McFadden confined his search strictly to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons. *He did not conduct a general exploratory search* for whatever evidence of criminal activity he might find.

(Emphasis supplied).

That frisk, limited though it may have been, started a revolution. In the *Terry* case itself, the initial tack taken by the State of Ohio was similarly to trivialize both the stop and the frisk as insignificant phenomena below the radar screen of the Fourth Amendment. The major premise of the *Terry* opinion, however, was that the Fourth Amendment was sensitively alert:

> There is some suggestion in the use of such terms as "stop" and "frisk" that such police conduct is outside the purview of the Fourth Amendment because neither action rises to the level of a "search" or "seizure" within the meaning of the Constitution. *We emphatically reject this notion.*

392 U.S. at 16, 88 S.Ct. 1868 (emphasis supplied).

The Supreme Court could not have been more emphatic about the seriousness of even a limited frisk or pat-down for weapons:

> *[I]t is nothing less than sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing* all over his or her body in an

attempt to find weapons *is not a "search."* Moreover, it is simply fantastic to urge that such a procedure "performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a 'petty indignity.' " *It is a serious intrusion upon the sanctity of the person,* which may inflict great indignity and arouse strong resentment, and *it is not to be undertaken lightly.*

392 U.S. at 16–17, 88 S.Ct. 1868 (emphasis supplied).

In its effort to justify the initial frisk or pat-down in this case, the State has shifted doctrinal gears.[1] At the suppression hearing, it argued that the pat-down was a reasonable police prerogative as a natural incident of a field interview. On appeal, it has abandoned that line of reasoning and now argues that the appellant voluntarily consented to the frisk.

 Deferring for a moment our analysis of Fourth Amendment justification, either by way of reasonable suspicion under *Terry* or by way of voluntary consent, our first working premise is that what was involved was a Fourth Amendment seizure of the appellant's person. To whatever extent, therefore, voluntary consent may arguably save the day for the State, it will have to do so as a firmly rooted exception to the warrant requirement, thereby satisfying the Fourth Amendment, and not as an exempting circumstance, taking the frisk out from under Fourth Amendment scrutiny. It will have to qualify as an instance of the Fourth Amendment Satisfied and not an instance of the Fourth Amendment Inapplicable.

As to the status of the frisk or pat-down as a seizure of the person and a search of the person, *Terry v. Ohio* left no room for doubt:

---

1. It is perhaps ungallant to notice that the State, waving the banner of non-preservation, took the appellant to task for a comparable shift of doctrinal gears between the suppression hearing and this appeal. The subject before us is a warrantless automobile search, timely objected to. As long as they stay under that broad umbrella, we are going to give both parties reasonable maneuvering room.

*[T]here can be no question,* then, *that Officer McFadden "seized" petitioner and subjected him to a "search" when he took hold of him and patted down the outer surfaces of his clothing.* We must decide whether at that point it was reasonable for Officer McFadden to have interfered with petitioner's personal security as he did.

392 U.S. at 19, 88 S.Ct. 1868 (emphasis supplied).

### The Seizure of the Appellant's Person

As our analysis moves forward, we may now largely lay aside the term of art "frisk" or "pat-down." That action, by whatever name, did not produce any directly incriminating evidence. For purposes of further analysis, what matters is that the frisk or pat-down, as we have previously discussed, constituted a seizure of the appellant's person. It is in that capacity that it is now analytically pertinent. "Seizure of the person," therefore, is the thing on which we shall now be focusing.

Our initial concern will be with whether the seizure of the appellant's person was constitutional or unconstitutional. If unconstitutional, our concern will then be 1) whether it, as an antecedent Fourth Amendment violation, tainted the ostensible consent to the automobile search that followed; or 2) whether the primary taint was so attenuated that it had no meaningful cause-and-effect relationship to the consent that followed it. Was the consent the fruit of a poisonous tree?

### Two Constitutional Species And a Third Mutant Strain

Because the seizure of the appellant's person was warrantless, there were only two ways, under the circumstances of this case, in which it could possibly have been constitutionally justified. The first possibility would have been for it to have been a good *Terry*-frisk, following a *Terry*-stop, based on reasonable suspicion to believe that the person stopped was armed and dangerous. The second constitutional candidate for justification is the strained but theoretically conceivable possibility that the appellant voluntarily consented to the seizure of his person in the form of the frisk.

Intertwined with our analysis of these two well recognized constitutional possibilities, however, is the necessity that we also take a close look at a recently appearing doctrinal mutation. The State, or at least the police procedure in this case, seems to be advancing, somewhat haltingly, the non-constitutional and ill-defined notion that hovering between a mere accosting, on the one hand, and a *Terry*-stop-and-frisk, on the other, there has somehow evolved an intermediate level or stage called a "field interview," pursuant to which the police interviewer enjoys greater prerogatives than would otherwise be available in the course of a mere accosting. The very name "field interview" seems to confer a certain legitimacy and tone of authority. It is frankly the recent appearance of this doctrinal mutant or rogue strain that most concerns us in this case.

### The Frisk Was Not Reasonable
### Pursuant to *Terry v. Ohio*

We turn our attention first to the possibility of a good *Terry*-frisk. This particular seizure of the appellant's person failed to qualify under *Terry v. Ohio* for several independent reasons. In the first place, the State concedes that there was no reasonable basis for either a *Terry*-stop or a *Terry*-frisk. In its appellee's brief, the State foregoes any reliance on *Terry*.

> Quite frankly, *the State agrees that Officer Talley did not have reasonable, articulable suspicion* at that point in the chain of events *to detain and frisk Graham*. Rather, the above evidence establishes that it was a consensual encounter at that juncture, and that Graham was not, in fact, seized.

(Emphasis supplied).

At the suppression hearing, the State made no argument based on *Terry*, and the judge made no finding of justification based on *Terry*. With respect to the effect of such a concession, moreover, our observation in *Reynolds v. State*, 130 Md.App. 304, 314, 746 A.2d 422 (1999), is very pertinent:

> [T]he State's concession that no basis exists to justify a
> *Terry* stop and our concurrence, upon our independent
> constitutional appraisal, in *the legal efficacy of that conces-*
> *sion relieves appellant of the task of responding to or*
> *countering any argument that there was any legal basis for*
> *the detention of appellant other than that it was consensu-*
> *al.*

(Emphasis supplied).

## A. No Articulated Suspicion That the Appellant Was Armed

Quite aside from that concession, Officer Talley never ut-
tered a syllable that would support a *Terry*-frisk. Even if the
telephone report and its modest corroboration could, *arguen-*
*do,* be considered some justification for a *Terry*-stop, the
justification for a *Terry*-frisk is a totally different matter,
based on totally different considerations. In *Gibbs v. State,* 18
Md.App. 230, 306 A.2d 587 (1973), this Court engaged in a
thorough-going analysis of the then recently promulgated
stop-and-frisk law. As to the difference between the two
phenomena and the different interests they serve, we ob-
served:

> It is furthermore clear that *the policeman must be able to*
> *articulate specific facts justifying* both the "stop" and, *quite*
> *independently, the "frisk." The latter does not follow inex-*
> *orably from the former.* *Terry* points out very emphatically
> that different governmental interests are involved in
> "stops," on the one hand, and "frisks," on the other hand.
> Although a reasonable "stop" is a necessary predecessor to
> a reasonable "frisk," *a reasonable "frisk" does not inevita-*
> *bly follow in the wake of every reasonable "stop."*

18 Md.App. at 238–39, 306 A.2d 587 (emphasis supplied).

The respective interests served by stops and by frisks
are distinct. The stop is crime-related. What is, therefore,
required is reasonable suspicion that a crime has occurred, is
then occurring, or is about to occur. The frisk, by contrast, is
concerned only with officer safety. What is, therefore, re-
quired is reasonable suspicion that the person stopped is

armed and dangerous. *Terry v. Ohio,* 392 U.S. at 23, 88 S.Ct. 1868, pointed out the need for that independent justification:

> "The crux of this case, however, is not the propriety of Officer McFadden's taking steps to investigate petitioner's suspicious behavior, but rather, whether there was justification for McFadden's invasion of Terry's personal security by searching him for weapons in the course of that investigation."

We spoke to the same distinct interest and distinct justification in *Gibbs v. State,* 18 Md.App. at 241, 306 A.2d 587:

> Even after a reasonable "stop" has been made, *the governmental interest which permits the further intrusion of a limited search—a "frisk"—of the person is not the prevention or the detection of crime, but rather the protection of the officer making the "stop."* This interest was delineated in *Terry,* at 392 U.S. 23–254, 88 S.Ct. 1868:
>
> > "We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him . . ."

(Emphasis supplied). *Alfred v. State,* 61 Md.App. 647, 664, 487 A.2d 1228 (1985), also observed:

> Even if the stop had been legitimate, that would not imply the legitimacy of the frisk. As a distinct intrusion, the frisk requires its own independent justification.

### B. No Articulation of the Purpose of or Predicate for a Frisk

One of the key requirements of reasonable suspicion, for either a stop or a frisk, is not only that it be present but that it be actually articulated. For a good frisk, it is not enough that in the abstract facts have been developed that might, objectively, permit some officer somewhere to conclude that the suspect or stopee was armed and dangerous. It is required that the frisking officer actually articulate the factors

that lead to his reasonable suspicion that a frisk was necessary for his own protection.

*Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), was the companion case to *Terry v. Ohio.* In *Sibron* an officer had stopped a suspected narcotics dealer. When the suspect made a sudden move into his jacket pocket, the officer moved simultaneously toward the same pocket and recovered contraband. Although the facts, objectively, might have been enough to support a frisk for weapons, the fatal flaw was that the officer never testified that self-protection was his purpose. The Supreme Court observed in this regard:

> *The possibility that Sibron,* who never, so far as appears from the record, offered any resistance, *might have posed a danger to Patrolman Martin's safety was never even discussed as a potential justification* for the search. The only mention of weapons by the officer in his entire testimony came in response to a leading question by Sibron's counsel, when Martin stated that he "thought he [Sibron] might have been" reaching for a gun. Even so, *Patrolman Martin did not accept this suggestion* by the opposition *regarding the reason for his action; the discussion continued upon the plain premise that he had been looking for narcotics all the time.*

392 U.S. at 46 n. 4, 88 S.Ct. 1889 (emphasis supplied).

In holding that the officer had failed to articulate the only rationale that will legitimate a frisk, the Supreme Court stated:

> In the case of the self-protective search for weapons, *[the officer] must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.* Patrolman Martin's testimony reveals no such facts. The suspect's mere act of talking with a number of known narcotics addicts over an eight-hour period no more gives rise to reasonable fear of life or limb on the part of the police officer than it justifies an arrest for committing a crime. *Nor did Patrolman Martin urge that* when Sibron

put his hand in his pocket, *he feared that he was going for a weapon and acted in self-defense.*

392 U.S. at 64, 88 S.Ct. 1889 (emphasis supplied). In *Gibbs v. State,* 18 Md.App. at 242–43, 306 A.2d 587, this Court characterized the *Sibron* holding:

Contrasting with the situation in *Terry* is that in *Sibron. The officer,* in that case, *never testified that he feared that Sibron was armed or that he acted to protect himself* from danger. The Supreme Court stressed that the officer "never at any time put forth the notion that he acted to protect himself." The Court pointed out that a reasonable "frisk" does not follow inevitably in the wake of every reasonable "stop," but requires specific justification.

(Emphasis supplied).

The same failure of the frisking officer to articulate a reasonable suspicion and a self-protective purpose within the contemplation of the frisk rationale was fatal in the *Gibbs* case itself.

*Officer Stewart never testified that he feared that the appellant might be armed or that he acted out of self-protection.* Although only reasonable suspicion and not probable cause is required to justify a "frisk," in the case at bar no predicate at all was established, whatever its quantitative measure.

18 Md.App. at 244, 306 A.2d 587 (emphasis supplied).

A similar failure of the officer to articulate his purpose and the basis of his suspicion invalidated the frisk in *Alfred v. State,* 61 Md.App. at 665, 487 A.2d 1228:

If in the present case the police had any reason to suspect that the appellant and Alexander were armed, *they failed utterly to articulate those reasons.* They provided no independent justification for the frisk at all.

(Emphasis supplied).

In *Whitehead v. State,* 116 Md.App. 497, 508, 698 A.2d 1115 (1997), the same failure of the officer to articulate a self-

protective purpose was fatal to the reasonableness of the frisk. As Judge Sonner observed:

> In this case, Trooper Donovan, unlike Officer McFadden [in *Terry v. Ohio*], did not articulate that he wished to conduct a search to protect himself, as authorized by *Terry* and the cases in Maryland following it. ... There was absolutely no evidence suggesting that the driver or passenger possessed weapons and, therefore, Trooper Donovan needed to search to protect himself. *Terry* and its progeny are not applicable to the present situation. We find that the search was unconstitutional.

## C. The Absence of an Antecedent *Terry*–Stop

From the beginning in 1968, the Supreme Court made it clear that there is a necessity principle behind permitting the police to execute a frisk on a predicate less substantial than probable cause. When a police officer's duty requires that he stop and interrogate potentially dangerous individuals suspected of engaging in crime, he must be permitted, when there is reasonable suspicion of danger, to act for his own self-protection. A *Terry*-frisk, therefore, may, frequently but not always, follow a *Terry*-stop. The corollary is that a reasonable *Terry*-stop is a condition precedent to a reasonable *Terry*-frisk. *Simpler v. State,* 318 Md. 311, 319, 568 A.2d 22 (1990); *Gibbs v. State,* 18 Md.App. at 238–39, 306 A.2d 587.

It was the concurring opinion of Justice Harlan in *Terry v. Ohio* that most articulately explained the necessity of an antecedent *Terry*-stop.

> [I]f the frisk is justified in order to protect the officer during an encounter with a citizen, *the officer must first have constitutional grounds to insist on an encounter,* to make a *forcible* stop. Any person, including a policeman, is at liberty to avoid a person he considers dangerous. If and when a policeman has a right instead to disarm such a person for his own protection, he must first have a right not to avoid him but to be in his presence. *That right must be more than the liberty* (again, possessed by every citizen) *to*

*address questions to other persons,* for ordinarily the person addressed has an equal right to ignore his interrogator and walk away; he certainly need not submit to a frisk for the questioner's protection. I would make it perfectly clear that *the right to frisk* in this case *depends upon the reasonableness of a forcible stop to investigate a suspected crime.*

392 U.S. at 32–33, 88 S.Ct. 1868 (concurring opinion of Harlan, J.) (emphasis supplied).

4 Wayne R. LaFave, *Search and Seizure* (3d ed.1996), pp. 247–49, states the same constitutional principle:

*[A] frisk for self-protection cannot be undertaken when the officer has unnecessarily put himself in a position of danger by not avoiding the individual in question.* This means that in the absence of some legitimate basis for the officer being in immediate proximity to the person, a degree of suspicion that the person is armed which would suffice to justify a frisk *if* there were that basis will not alone justify such a search. For example, if a policeman sees a suspicious bulge which possibly could be a gun in the pocket of a pedestrian who is not engaged in any suspicious conduct, the officer may not approach him and conduct a frisk. And this is so even though the bulge would support a frisk had there been a prior lawful stop. Likewise, *if an officer, lacking the quantum of suspicion required by Terry to make a forcible stop, instead conducts a non-seizure field interrogation, he may not frisk the person interrogated upon suspicion he is armed;* in such a case the officer may protect himself by not engaging in the confrontation.

(Emphasis supplied).

In this case, of course, there was no antecedent *Terry*-stop. There was a mere accosting. Even had there been no concession by the State in this case, the frisk of the appellant could not have been constitutionally justified as a *Terry*-frisk because 1) the facts would not have added up to reasonable suspicion that the appellant was armed, 2) Officer Talley did not articulate any basis for frisking the appellant for his own

self-protection, and 3) there was no antecedent *Terry*-stop creating a possible necessity for a *Terry*-frisk.

### Calling a Mere Accosting a "Field Interview" Does Not Enhance Its Constitutional Status

 We deliberately belabor our analysis of the constitutional requirements for a good *Terry*-frisk to drive home the point that the same kind of frisk, in the complete absence of the prescribed *Terry* requirements, could not conceivably be deemed legitimate as an automatic incident of a so-called "field interview."

 At the suppression hearing, the State never argued nor sought to prove that the initial frisk was consensual. In argument, the prosecutor, in a mere passing phrase, glossed over the frisk as if it were a routine incident of a field interview.

> [W]hen the officer arrived he testified that Mr. Graham was not intoxicated, that he was in clear hold of his faculties, and that *during the course of this field interview, after the officer checked him for weapons,* the officer asked him if the keys in his pocket, or if this was his car.

(Emphasis supplied).

The trial judge also gave no thought to consent but, rather, treated the frisk as an automatic police prerogative when conducting a field interview.

> I find the credible testimony to be that of Officer Talley, that he received a call about a person matching the defendant's description and not Mr. Griggs' description selling drugs. That because the tip was so raw that it didn't give him probable cause to arrest anybody that *he field interviewed the defendant,* essentially for future reference. Because if he kept getting calls and he kept coming back, at some point it was going to amount to probable cause and he wanted to know who he was dealing with.

And *so, he basically had the right to do the limited pat down for the gun.*

(Emphasis supplied).

The testimony of Officer Talley, moreover, indicated that the pat-down was just part of his routine procedure in conducting a field interview.

Q [By Defense Counsel] Now, I just want to get the chronology of this correct. You walked up to Mr. Graham—

A Right.

Q —because you got this call over the radio.

A Exactly.

Q And you conducted a field interview.

A Yes, ma'am.

Q *And then you patted him down.* You didn't find any weapons. *Is that correct?*

A *Okay.*

Q Is that correct?

A *I patted him down, conducted my field interview, then asked him, told him he could have a seat.*

Q Okay. And then you started asking him about the car. Is that correct?

A Exactly. *I like to speak to people and pat them down before I really start to talk to them because they might have a weapon on them.*

Q Okay. *So you made sure he didn't have a weapon,* found out his name, date of birth, that kind of thing, asked him to have a seat down next to Mr. Griggs?

A *Yes, ma'am.*

(Emphasis supplied).

■ There is something inherently surrealistic about that entire encounter. It illustrates the danger of even creating, without any imprimatur from the Supreme Court, a term of art or a category called the "field interview." A field interview is simply one instance, out of innumerable instances, of a

mere accosting. It is a treacherous phrase, however, in that it inevitably suggests 1) that a field interview may enjoy some enhanced constitutional status over other accostings, 2) that there may be departmental policies directing how field interviews should be conducted and commanding some modicum of respect, and 3) that the police officer may possess certain prerogatives to control such special accostings not possessed by the other party to the accosting. Such suggestions, however, are figments of the imagination. Within the constitutional category of accosting, there are no separate levels with shifting assignments of favored or disfavored status. Yet if the field interview is no different than other accostings, some will ask, why does it have a special name?

The classic Supreme Court opinions explicating the phenomenon of accosting are *Immigration and Naturalization Service v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); and *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). From the beginning, the accosting cases undertook to disabuse bench and bar of the notion that the police need special Fourth Amendment justification even to approach and to talk to citizens. There has never been a suggestion that a police officer enjoys a greater than ordinary right to approach and talk. The message, rather, is that the police officer enjoys no less a right. The officer possesses the same privilege as anyone else to approach a stranger and to ask, 1) "What time is it?", 2) "How do I get to Camden Yards?", or 3) "Would you like to buy a ticket to the Policeman's Ball?"

Both parties to such mutual and voluntary exchanges stand as equals of each other. Neither is in a dominant role. It is inconceivable that one civilian would ever approach another and ask, "Can you tell me how to get to Camden Yards, and, by the way, would you mind if I frisk you before you begin to tell me?" It is inconceivable that one civilian would approach another and ask, "Can you, please, tell me what time it is and, by the way, would you mind sitting down there on the curb before you tell me? I don't want you suddenly to run away."

There is something discernibly official and hierarchical about such questions. We are asked to accept them as reasonable under the rubric of "field interview." It is hard, however, to buy something called a field interview, with its decided tilt of the respective prerogatives, as a genuine instance of a mere accosting. It is not a mere polite exchange between equals. What would everyone's reaction have been, for instance, if the appellant had presumed to frisk Officer Talley? We pay lip service to mutuality, but we obviously do not really mean it.

It is, of course, reasonable for a police officer on the street to act with tactically wise precaution at all times. No one gainsays that. The unavoidable consequence of such sound tactics, however, is the inevitable risk that the well-advised use of precautionary tactics may, by way of direct proportion, bring an encounter within the notice of the Fourth Amendment. The fiction is that one can enjoy the prerogative of police status without assuming the concomitant burden, but one comes with the other. Sound tactics are eminently sound, but they do have a price.

To the extent to which the "field interview" seems to suggest some enhanced police prerogatives, it is only because "field interview" is frequently a far apter synonym for a stop-and-frisk than it is for a mere accosting.

It is our *de novo* determination that the circumstances here, even as described by Officer Talley, do not add up to a mere accosting. *A fortiori*, Officer Talley had no right to pat down the appellant as a routine incident of the species "field interview" of the genus "accosting." In *Simpler v. State,* 318 Md. 311, 321–22, 568 A.2d 22 (1990), Judge Rodowsky pointed out for the Court of Appeals that the prerogative of frisking a suspect does not follow automatically from even every good *Terry*-stop, let alone as an incident of a mere accosting:

> [T]he circuit judge found that it was "normal for the officer to patdown those who were there, his training. . . ." The finding echoes Wassmer's testimony that the patdowns were "a matter of routine caution." *Underlying the testimony*

*and the finding is the notion that any lawful stop justifies
a frisk. As we have seen above, that is not the law.*
Rather, the burden was on the State at the suppression
hearing to demonstrate that the seizure fell within one of
the well-delineated exceptions to the warrant requirement.
(Emphasis supplied). The problem is one for the Fourth
Amendment.

### A Consensual Frisk?

The second possible way in which the warrantless
seizure of the appellant's person in this case might have been
justified under the Fourth Amendment would be if the appel-
lant had voluntarily consented to the frisk. Initially, it is hard
to accept that even a request for a frisk, let alone a frisk itself,
would not constitute such a "show of authority" by a uni-
formed officer as to push any submission to it into the
category of a Fourth Amendment seizure of the person.
*California v. Hodari D.,* 499 U.S. 621, 626, 111 S.Ct. 1547, 113
L.Ed.2d 690 (1991); *Green v. State,* 145 Md.App. 360, 802 A.2d
1130 (2002) ("A seizure can occur . . . by a 'show of authority'
coupled with submission to that authority."). No case has
been cited to us, and we know of none, in which the consent to
a request to be frisked has been deemed to be an act of
voluntary consent rather than submission to a "show of au-
thority."

The very phrase "consensual frisk" borders on being an
oxymoron. May one consent to a seizure of one's person so as
to relieve the police of any necessity to show reasonable or
articulable suspicion? May one consent to an arrest so as to
relieve the police of any necessity to show probable cause? At
what point may an ostensible consent to a procedure be so
extreme as to pass out of the realm of mere accosting into
some less temperate constitutional zone? There could be
some heavy questions here, if it were necessary to face them.

The more direct resolution of this consent question, howev-
er, is that there was no evidence that the appellant's consent
to the frisk was ever given. The circumstances here are
eerily reminiscent of those in *Charity v. State,* 132 Md.App.

598, 634–35, 753 A.2d 556 (2000), a case in which we rejected the State's argument that the suspect had voluntarily consented to a pat-down of his person.

> Even according to Sergeant Lewis's own testimony, *he never expressly asked the appellant for permission. He simply expressed his desire to conduct a pat-down. The appellant, in turn, never expressly gave permission. He simply held out his arms* in what may have been nothing more than an act of acquiescence.
>
>> A: I said, sir, *I would like to pat you down for any weapons.* You don't have any guns on you or anything, do you?
>>
>> He said, no sir. And *he held his arms out to his side* just like I am doing right now.

(Emphasis in original).

Officer Talley's testimony with respect to the frisk similarly gave no indication that the appellant ever said a thing or did anything other than quietly submit to the officer's pat-down.

> A I asked him can I search him just for weapons. I didn't go in his pockets. I didn't go into his coat or nothing like that. I just checked him.
>
> Q So you did a pat down for weapons?
>
> A Yes, ma'am.

At the suppression hearing, the State never argued that the appellant consented to the frisk. The judge never found or ruled that the frisk was consensual. He treated it as an automatic police prerogative when conducting a field interview. The State argues, for the first time on appeal, that the frisk was consensual. The State's argument on this issue is exceedingly brief. Its factual predicate consists only of the following:

> During the field interview, Officer Talley asked Graham whether he would mind being searched for weapons, and *when Graham did not object,* Officer Talley patted him down.

(Emphasis supplied). Proceeding from that, the State's legal argument is not only brief but is a stretch almost beyond the breaking point.

Graham's claim that the pat-down for weapons was constitutionally invalid, also lacks merit. Here, the officer's testimony disclosed that Graham gave him permission to conduct the pat-down search for weapons.

"Graham gave him permission"? That's quite a leap of logic. The failure expressly to object or the failure physically to resist may be indicative only of acquiescence and not necessarily of voluntary consent.

If this issue of voluntary consent to being frisked were even in doubt, what would be fully dispositive would be the allocation of the burden of proof on the question of consent, a subject we have fully discussed earlier in this opinion. The burden was on the State to prove that the appellant freely and voluntarily consented to the frisk of his person. *Bumper v. North Carolina*, 391 U.S. at 548, 88 S.Ct. 1788; *United States v. Mendenhall*, 446 U.S. at 557, 100 S.Ct. 1870; *Schneckloth v. Bustamonte*, 412 U.S. at 222, 93 S.Ct. 2041; *Doering v. State*, 313 Md. at 401–02, 545 A.2d 1281. We hold that the State did not carry that burden on this issue.

### The Poisonous Tree

What we have then at this stage of our analysis is that, moments into the encounter between the appellant and Officer Talley, the appellant was subjected to both a seizure of his person and a limited search of his person in violation of the Fourth Amendment. For possible exclusionary purposes, that is "the poisonous tree." Its implications for the subsequent ostensible consent to the automobile search are ominous. As Judge Hollander observed with respect to a similar ostensible consent in *Green v. State*, 145 Md.App. 360, 802 A.2d 1130 (2002):

[I]f the continued detention was unlawful, any consent procured during that time would be tainted.

### Attenuation of Taint

What remains to be seen is whether the physical evidence of the appellant's guilt was "the fruit of the poisonous

tree." The "fruit of the poisonous tree" doctrine concerns the exclusion of secondary or derivative evidence. The doctrine was born in Justice Holmes's opinion for the Supreme Court in the case of *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). As an amelioration of the doctrine's potential harshness, *Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), recognized an exemption from exclusion for derivative evidence when the cause-and-effect relationship between the primary taint and the ultimate evidence is thinly attenuated. Justice Frankfurter explained attenuation:

> Sophisticated argument may prove a causal connection between information obtained through illicit wire-tapping and the Government's proof. As a matter of good sense, however-er, *such connection may have become so attenuated as to dissipate the taint.*

308 U.S. at 341, 60 S.Ct. 266 (emphasis supplied).

*Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), also dealt with attenuation, as it posed the critical question to be:

> "[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

371 U.S. at 488, 83 S.Ct. 407.

■ The issue before us is whether the appellant's ostensible consent to the search of his automobile was tainted by the antecedent seizure and search of his person in violation of the Fourth Amendment. If the taint was not attenuated, it would trump any apparent voluntariness within the contemplation of *Schneckloth v. Bustamonte.* 5 Wayne R. LaFave, *Search and Seizure* (3d ed.1996), p. 280, spoke to the foreclosing effect of a prior illegal seizure of the person.

> The mere fact that a consent to search is "voluntary" within the meaning of *Schneckloth v. Bustamonte* does not mean that it is untainted by the prior illegal arrest. In *Brown v.*

*Illinois* [422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) ], the Supreme Court rejected the notion that a confession obtained after an illegal arrest is untainted merely because it is "voluntary" in the Fifth Amendment sense, and it would seem to follow from this that the mere fact a consent is "voluntary" (which the Court in *Schneckloth* said was determined as in confession cases) does not remove the taint. Rather, the *Brown* factors discussed elsewhere herein, should be applied to this situation.

Professor LaFave also pointed out that the adverse impact of an antecedent Fourth Amendment violation is double-barreled. It may *ipso facto* dictate exclusion under the "fruit of the poisonous tree" doctrine. It may independently figure in as a negative factor in assessing the voluntariness of consent. The two phenomena overlap massively, but they are not literally the same.

In discussing whether a subsequent consent to a search is, on the one hand, attenuated or, on the other hand, an exploitation of the primary taint, 3 LaFave, *Search and Seizure,* lists, at 660–62, a number of pivotal factors:

In determining whether the consent was, as the Court put it in *Brown,* "obtained by exploitation of an illegal arrest," account must be taken of *the proximity of the consent to the arrest, whether the seizure brought about police observation of the particular object which they sought consent to search,* whether the illegal seizure was "flagrant police misconduct," *whether the consent was volunteered rather than requested by the detaining officers, whether the arrestee was made fully aware of the fact that he could decline to consent* and thus prevent an immediate search of the car or residence, *whether there has been a significant intervening event* such as presentation of the arrestee to a judicial officer, and whether the police purpose underlying the illegality was to obtain the consent.

(Emphasis supplied).

A consideration of those factors leads us to the ineluctable *de novo* determination that the primary taint in this case was not attenuated.

Looking first at the proximity between the seizure of the appellant's person and the ostensible consent to the search of the automobile, the passage of time between the frisk and the appellant's saying, "Sure, go ahead," with respect to trying the car keys was hardly more than a minute, two minutes at the most.

Q So you did a pat down for weapons?

A Yes, ma'am.

Q And then what happened?

A He didn't have no weapons on him, so I finished talking to him. I asked him whose vehicle it was. He said it was some guy's up the street. So I asked him why was he leaning on it. And he was like he was just leaning, just chilling, just hanging out.

Q And did there come a time when you asked him for the keys to the car?

A Yes. I asked him, the keys in his pocket. I asked him whose keys, I mean, when I asked him whose keys in his pocket, he said they mine. I said do they fit the vehicle. He was like no, they don't fit the vehicle.

Q And once he said they don't fit the vehicle, what did you do.

A I asked him do you mind if I try. He was like sure, go ahead, they're not going to fit. So that's when he hands me the keys out of his pocket.

The second factor is whether the unconstitutional frisk brought about Officer Talley's knowledge of the keys, which the officer then sought the consent of the appellant to try in the door of the car. But for the frisk, Officer Talley had no way of knowing that there were car keys in the appellant's pocket. When the appellant disclaimed ownership of the car, Officer Talley immediately demanded to know what the keys were for. When the appellant claimed that his keys would not fit that car, Officer Talley sought his permission to try the keys on the car door for himself.

If Officer Talley had not obtained knowledge of the keys in the appellant's pocket, half the subject matter of the so-called field interview would not have existed and the literal object of the consent that was sought and ostensibly given would have been unknown to the officer. Without the keys, any request for consent in this case would have had to have taken a very different form and the issue as it now exists would not be before us. The keys establish irrefutable linkage between the frisk and what followed, not attenuation.

Even the lesser factors listed by Professor LaFave argue against attenuation. The consent was not volunteered by the appellant but was requested by Officer Talley. The appellant was not advised of the fact that he could decline to consent. There was not even a trivial, let alone a significant, intervening event. The primary taint in this case was not attenuated.

### Chasing the Rainbow And Looking for the Unicorn

In approaching the critical ruling on consent to the car search, the initial instincts of the motions judge that he was being asked to enter treacherous waters were unerring. His words were prophetic.

> I always cringe when I have to litigate a motion to suppress where the exception to the warrant requirement is consent because *just about everything is mere submission to a claim of lawful authority.*
>
> And while it is convenient for the officers on the street to cut out the paperwork and obtain consent, *consent like the rainbow and the unicorn is very evanescent.* And what looks good in the woods often doesn't stand up to the light of day. So, as I say, I cringe whenever I have to resolve a consent issue because it is very hard to do so.

(Emphasis supplied).

There then followed the famous last words, "However, in this case...."

### The Scope of the Consent

Before turning to the issue of voluntariness, we cannot help but note, in passing, that there could be a very real issue as to

whether the appellant's consent, even if assumed for the sake of argument to have been voluntary, ever extended to the search of the car.

The total discussion between Officer Talley and the appellant centered about whether the keys in the appellant's pocket fit the car on which the appellant was leaning. Officer Talley obviously expected that they did. The appellant claimed that they did not. A skeptical Officer Talley asked if he could try the keys in the car door for himself. Still protesting that they would not fit, the appellant, voluntarily or involuntarily, agreed to let Officer Talley try the keys in the door for himself. It still takes a leap of logic to get from that ostensible agreement about trying the keys in the door to a consent for the officer to search the vehicle for evidence of crime. Does "You may try the keys in the door" imply "You may search the car?". That would seem to depend on the conversational context in which the words were said.

Not a word was ever uttered about any desire on Officer Talley's part to search the car. It was not suggested what the purpose of such a search might be or that Officer Talley had any reason even to suspect that the car might contain evidence of some sort of crime. The words "narcotics" or "drugs" were never mentioned and, therefore, could have served as no predicate for an inference as to the officer's purpose in asking for the keys. See *Florida v. Jimeno*, 500 U.S. 248, 251–52, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). For all anyone could tell from the transcript of the conversation, the officer could have been investigating a murder or a kidnapping or a bank robbery or nothing at all.

The discussion had been focusing exclusively on the ownership of the car and on nothing else. If the keys had fit the car door, that would have confirmed the appellant's identity as the owner or driver of the vehicle and there was no indication that Officer Talley was looking for anything beyond that. For all that the transcript of the suppression hearing revealed, Officer Talley could have been 1) investigating a stolen car or 2)

looking for a driver who had recently been involved in a hit-and-run accident or 3) running down a scofflaw with numerous outstanding parking tickets. In any such case, identifying the appellant with the vehicle would have been all that was required and all, presumably, that the officer desired to accomplish. It is random speculation to conclude either that Officer Talley had any wish to search the car or that the appellant ever consented to such a search.

The open-ended uncertainty as to what might be inferred from so vaporous a predicate cuts against the State, moreover, when it is remembered that the burden of proof is allocated to it to establish the ultimate efficacy—both the voluntariness and the scope—of the consent. Everybody here took a lot for granted with no shred of support in the transcript. Because we are ruling against the State on the issue of the voluntariness of the consent, however, it is unnecessary to rest our decision on the deeply troubling qualms we have about the scope of the consent.

### The Voluntariness of the Consent

■ As we turn to the issue of voluntariness, we shall assume, purely *arguendo*, that the appellant's agreement to have his keys tried in the car door was tantamount to an agreement to have the car searched for evidence.

The antecedent unconstitutional seizure and search of the appellant may well have been, under the "fruit of the poisonous tree" doctrine, *per se* dispositive of the ultimate consent issue. That certainly was the teaching of *Florida v. Royer*, 460 U.S. 491, 507–08, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983):

> Because we affirm the Florida District Court of Appeal's conclusion that *Royer was being illegally detained when he consented to the search* of his luggage, we agree that *the consent was tainted by the illegality* and was ineffective to justify the search.

(Emphasis supplied).

In that regard, our statement in *Charity v. State*, 132 Md.App. 598, 634, 753 A.2d 556 (2000), would leave little doubt:

*If the consent were sought and given during a period of unconstitutional detention, however, that factor alone, ab-sent attenuation between the initial taint and the presump-tively poisoned fruit, would be dispositive that the consent was not voluntary.*

(Emphasis supplied).

In *Green v. State,* 145 Md.App. 360, 802 A.2d 1130 (2002), Judge Hollander explained that even an ostensibly voluntary consent will be deemed involuntary if it were obtained during a period of unlawful detention:

Although we accept the circuit court's first level finding that the appellant "consented" to the search, we must independently determine the voluntariness of that consent, in light of the character of the encounter that culminated in that consent. The threshold question is whether the contin-ued encounter after the completion of the traffic stop consti-tuted a suspicionless seizure under Fourth Amendment law or, instead, a consensual encounter. *A consent to search procured during an illegal detention is invalid as the product of the illegal seizure—the so called fruit of the poisonous tree.*

(Emphasis supplied).

It is unnecessary for us to rely on that ground alone, however; because of our conclusion that the ultimate consent would not have been voluntary in any event. The antecedent Fourth Amendment violation is, however, at the very least a massive factor in our assessment of voluntariness.

■ Quite aside from the continuing and unattenuated corrosive effect of the unconstitutional seizure of the appel-lant's person that began with his being frisked, the totality of the circumstances a minute or two later, just as the automo-bile search began, would independently establish that the appellant was being unconstitutionally detained. Our bench-mark in this regard is *Ferris v. State,* 355 Md. 356, 735 A.2d 491 (1999).

A critical incriminating admission in that case, just as the ostensible consent to the automobile search in this case, occurred when the suspect was hovering in a constitutionally indeterminate status. If Ferris's presence at that precise place and at that precise time (standing between two cars shortly after the termination of a traffic stop) was consensual, to wit, amounting to no more than an accosting, the admission would have been voluntary and admissible. If, on the other hand, Ferris was in the throes of being detained by the police, the incriminating admission was tainted and inadmissible. Thus it is with the ostensible consent in this case.

In *Ferris*, the trial judge denied the motion to suppress and a split panel of the Court of Special Appeals affirmed that decision. In the grant of certiorari, one of the two questions for consideration by the Court of Appeals was that of "whether an operator of a motor vehicle is seized within the meaning of the Fourth Amendment when he is asked to get out of his car for questioning after a traffic stop is completed." 355 Md. at 368, 735 A.2d 491.

In that case, a prior traffic stop of Ferris had been undisputedly proper. The focus was on what happened immediately after the issuance of a traffic citation and, thereby, the official termination of the traffic stop. Was the immediately ensuing prolongation of the encounter a mere consensual accosting or a Fourth Amendment detention? The tone of the encounter there, just as the tone of the encounter here, was at all times cordial and polite.

Although Trooper Smith did not advise Ferris that he was free to depart or that he was not free to leave, the trooper testified: "I just asked him if he would mind stepping to the back of his vehicle to answer a couple of questions. He stated he didn't mind." Ferris accompanied the trooper to the rear of the Camry.

355 Md. at 363, 735 A.2d 491.

The State's position as to the character of the encounter as Ferris was answering questions while standing at the rear of his car exactly parallels the State's characterization of the

encounter in this case as the appellant was being asked for the keys in his pocket.

> The State postulates that "Ferris was merely *asked* to step from the vehicle" and asserts that "the fact that Ferris was asked to exit the vehicle for questioning [does not] transform the encounter into a seizure." *The State* likewise *describes the scenario immediately after Petitioner exited his car as one in which Trooper Smith "was merely asking Ferris questions, which questions Ferris voluntarily answered."* It is in this way that the State attempts to characterize the encounter as completely "consensual" and thus not subject to Fourth Amendment scrutiny.

355 Md. at 356, 735 A.2d 491 (emphasis supplied).

Ferris's position as to the overbearing nature of the encounter parallels the appellant's position in this case.

> Petitioner contends that the trooper's request that he move to the rear of the Camry and subsequent actions after the completion of the traffic stop constituted a seizure and was not a consensual encounter. We agree with Petitioner.

*Id.*

The Court of Appeals stated the critical test precisely as it has been set forth by the Supreme Court in *United States v. Mendenhall, Florida v. Royer,* and *Immigration and Naturalization Service v. Delgado.*

> The test to determine whether a particular encounter constitutes a seizure, or whether the encounter was simply a "consensual" non-constitutional event is whether a reasonable person would have felt free to leave.

355 Md. at 375, 735 A.2d 491.

After reminding us that in "making this determination, a court must apply the totality-of-the circumstances approach, with no single factor dictating whether a seizure has occurred," 355 Md. at 376, 735 A.2d 491, Judge Raker provided a list of factors that bear on the determination.

> Although the inquiry is a highly fact-specific one, courts have identified certain factors as probative of whether a

reasonable person would have felt free to leave. These factors include: the time and place of the encounter, *the number of officers present and whether they were uniformed, whether the police removed the person to a different location* or isolated him or her from others, *whether the person was informed that he or she was free to leave,* whether the police indicated that the person was suspected of a crime, *whether the police retained the person's documents,* and *whether the police exhibited* threatening behavior or *physical contact* that would suggest to a reasonable person that he or she was not free to leave.

355 Md. at 377, 735 A.2d 491 (emphasis supplied).

It is to a number of those factors that we now turn for guidance.

## A. The Number of Officers Present

 Officer Talley was in uniform and he had pulled up in a police car to where the appellant was standing. Just as the search was getting under way, "two or three" other police cars pulled up to the scene.

Q ... And were you alone?

A ... Other units had called because they heard over the radio so they just started coming also.

Q *So how many other units appeared?*

A *I'd say about two or three.*

Q And when you say other units, is that other individual police officers or cars?

A One police officer per one car.

Q So two or three police cars had driven up at that point?

A Yes, ma'am.

Q And you were talking to Mr. Graham who was sitting down.

A Right.

Q And the other officers approached?

A Right.

(Emphasis supplied).

Officer Talley revealed that the other officers were there "for officer safety reasons."

Q And did all of the other officers join you?

A *They just stood around, just for officer safety reasons,* that's all.

Q Okay. They are standing around you, basically.

A Right.

Q They want to see what's going to happen with this?

A Exactly.

(Emphasis supplied).

One of the other officers, moreover, was standing over the appellant and a companion where they had been directed to sit on the curb.

Q And where were the other officers when you were searching the car?

A *One officer was standing over there by Mr. Graham and Mr. Griggs,* Mr. William Griggs. And other officers were just standing around.

(Emphasis supplied).

With three or four police cars and three or four uniformed officers, standing there "for officer safety reasons," that factor tilts decidedly toward custody.

In *Ferris,* the Court of Appeals found the presence of two officers "increased the coerciveness," and it also noted the tactically-inspired positioning of one of the officers.

[T]he presence of two uniformed law enforcement officers increased the coerciveness of the encounter.... [T]he record also indicates that the deputy had positioned himself at the passenger side of the car when Trooper Smith asked Ferris to exit the Camry.

355 Md. at 383, 735 A.2d 491. In the *Ferris* case, 355 Md. at 367, 735 A.2d 491, the Court of Appeals also quoted with

approval the dissenting opinion in the Court of Special Appeals by Judge Thieme, as he had noted:

> Furthermore, the presence of two officers (one a county and one a State police officer) would have only added to the already mounting apprehension on the part of the driver.

*United States v. Mendenhall,* 446 U.S. at 553, 100 S.Ct. 1870, also noted the number of officers on the scene as a significant factor.

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers.

See also *Rosenberg v. State,* 129 Md.App. 221, 241, 741 A.2d 533 (1999); *Green v. State,* 145 Md.App. at 393, 802 A.2d 1130 ("[C]alling for back-up would generally signal to a reasonable person that the continuation of the encounter is not really a matter of choice.").

In *Reynolds v. State,* 130 Md.App. 304, 746 A.2d 422 (1999), a case in which this Court held a street encounter to have been non-consensual, Judge Davis commented on the number of the police as a significant factor in our determination.

> [G]iven the fact that Detective Coleman and Officer McNamara, a uniformed police officer, who had alighted from a marked police vehicle under circumstances which had caused eight or nine of appellant's companions to flee, we can only conclude that the actions of the police in this case were sufficiently threatening to dissuade appellant from continuing his departure from the scene.

130 Md.App. at 340, 746 A.2d 422.

In *Jones v. State,* 319 Md. 279, 285, 572 A.2d 169 (1990), the Court of Appeals, in holding a street encounter to have been non-consensual, commented on the possibly coercive effect of even a single officer when he pulls up in a marked car, exits the vehicle, and singles out a particular person for questioning.

> The officer was dressed in uniform and driving a marked patrol car. As Jones approached, the officer pulled his car

to the side of the road, exited the vehicle, and stood in the street when he called out to Jones using one of three salutations—"Hey, could you come here" or "Hold on a minute" or "Hey, wait a minute."

In *Trott v. State*, 138 Md.App. 89, 770 A.2d 1045 (2001), this Court, by way of contrast, found a street encounter to have been completely consensual. One of the factors we found to be significant in arriving at that conclusion was that the accosting officer "was alone and on foot."

Nor were patrol cars with flashing lights or other uniformed officers present. *Officer Middleton was alone and on foot when he approached appellant.* There is no evidence that his patrol car was visible or near the scene of the encounter.

138 Md. at 108, 113 A. 620 (emphasis supplied).

## B. The Movement of the Appellant to a Sitting Position on the Curb

 A factor that was found to be very significant in *Ferris,* and is of major significance to us, is the police officer's assertion of control over an encounter by the placement or positioning of the suspect in a place deemed by the officer to be tactically safer or more advantageous to his purpose. *Ferris* spoke of such a placement in that case:

Trooper Smith affirmatively sought to move Ferris from the relative comfort of his vehicle to a more coercive atmosphere between the Camry and the two patrol cars.

355 Md. at 382, 735 A.2d 491.

The dissent of Judge Thieme from the majority opinion of the Court of Special Appeals, quoted with approval by the Court of Appeals, 355 Md. at 367, 735 A.2d 491, also referred to the movement of the suspect as a coercive favor.

For the officer then to request the driver to exit the vehicle, separating the driver not only from the vehicle but also from any occupants who may have been in that vehicle, with no apparent justification for doing so, would clearly arouse a feeling that that person was not free to leave.

*Trott v. State,* 138 Md.App. at 108–09, 770 A.2d 1045, once again is instructive by negative example.

[A]ppellant was never asked by Officer Middleton ... to change his location as Ferris was. The entire encounter took place at precisely the same spot. In *Ferris,* the Court of Appeals was particularly troubled by that aspect of the Ferris encounter. ... In the instant case, however, no request was made that appellant take any action except to answer a few questions.

*Ferris* quoted with approval from George M. Dery III, *"When Will This Traffic Stop End?": The United States Supreme Court's Dodge of Every Detained Motorist's Central Concern—Ohio v. Robinette,* 25 Fla. St. U.L.Rev. 519, 556 (1998), as Dery referred to such placement as a device that "shifts control away from the [suspect] to the officer." *Ferris,* 355 Md. at 383, 735 A.2d 491, also quoted with approval from *United States v. Gonzales,* 842 F.2d 748, 752 (5th Cir.1988), overruled on other grounds, *United States v. Hurtado,* 905 F.2d 74 (5th Cir.1990) (en banc):

"[A] request that an individual move in some manner has been consistently regarded by this Court as persuasive evidence that a fourth amendment seizure has occurred."

See also *Reynolds v. State,* 130 Md.App. at 336, 746 A.2d 422.

Whether couched in terms of a "direction," a "suggestion," or a "request," Officer Talley very definitely asserted situational control by his placement of the appellant.

So that's when he hands me the keys out [of] his pocket. *I told him to have a seat on the steps,* and I opened the door on the driver's right side.

(Emphasis supplied). On cross-examination, the officer reverted to this indication to the appellant that the officer at least wished him to sit on the curb.

After I patted him down and I started talking to him, I did a field interview. Then after he passed me the keys, *then I asked him you can have a seat.*

(Emphasis supplied). Officer Talley again alluded to where he wanted the appellant to be during the search.

A *I* patted him down, conducted my field interview *then asked him, told him he could have a seat.*

. . . .

Q Was he sitting down before? Did you ask him to take a seat and then ask him for the keys?

A No. He passed me the keys first. *I said well you can have a seat next to the gentlemen he was talking to. That's when he sat down.*

(Emphasis supplied).

Eventually, Officer Talley explained his tactical purpose for the request. Police procedure teaches that it is "the proper way to conduct a field interview" and it will also slow the suspect down if he should decide to "take off running."

THE COURT: *Why did you tell the defendant to sit down* with Mr. Griggs when you did?

THE WITNESS: Because *the proper way to conduct a field interview* if you are going to run a 29 and just talk to people, *ask them to have a seat. I felt more comfortable.* If I was to find something, *he probably could take off running faster if he was standing right beside me.*

THE COURT: Well, was it an order for him to take a seat?

THE WITNESS: No. I said can you have a seat, and he said sure, no problem.

(Emphasis supplied).

Office Talley had already explained how one of the officers was in a position to keep watch over both the appellant and his companion as Officer Talley searched the car.

Q And where were the other officers when you were searching the car?

A *One officer was standing over there by Mr. Graham and Mr. Griggs.*

(Emphasis supplied).

The appellant was clearly led·to understand that the police wished·him to sit down on the curb beside his companion. The appellant acquiesced. That placement enhanced and was intended to enhance the police control over the encounter.

## C. The Lesser Suspect Was Detained

There is another extremely revealing circumstance in this case that was not one of the factors listed in *Ferris*. The appellant's companion from the start to the finish of this encounter was William Griggs. Rather than being allowed to walk away, William Griggs was most definitely detained.

Q Officer Talley, was there anybody else, there was one other person with Mr. Graham when you came up there, wasn't there?

A Yes, ma'am.

Q *And that person you put under arrest as well. Is that correct?*

A *Yes, ma'am. Detained him, yes. He wasn't under arrest. We detained him.*

Q *You detained him?*

A *Yes, ma'am.*

. . . .

THE COURT: ... And *what was your basis for detaining Mr. Griggs?*

THE WITNESS: Because both of them was, one was leaning against the car, and one was sitting on the step. And *since they both was talking, I just wanted to detain them for a couple of minutes,* that's all.

THE COURT: *You assumed* from what you saw that *they both had dominion and control over the contents of the car? Is that what you are saying?*

THE WITNESS: *Yes, sir.*

(Emphasis supplied).

Ironically, William Griggs was the lesser suspect because he, unlike the appellant, had not been described in the telephone call to the police. Officer Talley did not equivocate about having detained William Griggs.

Q Now, *when you say you detained Mr. Griggs, what did you do?*

A I was talking to him also. *I didn't put no handcuffs on him yet. I was just talking to him.* That's all.

Q Was he on his knees?

A No, ma'am. He wasn't on his knees.

Q Was he sitting on the ground?

A No. He was still sitting on the step. *I never moved him because the description came out for that gentleman.*

Q *Identifying Mr. Graham?*

A *Yes, Mr. Graham.*

Q Okay. So when you approached Mr. Graham and you asked to talk to him, you told him to sit down next to Mr. Griggs.

(Emphasis supplied).

Officer Talley's testimony established the restraint imposed on William Griggs. From the detentionary status of that lesser suspect, we may draw a *de novo* inference as to the detentionary status of the greater suspect.

## D. The Failure to Inform the Appellant That He Was Free to Leave

Officer Talley never informed the appellant that he was free to walk away at any time. That is not, of course, a necessary condition for a mere accosting. It is, however, a significant factor in distinguishing a mere accosting from a Fourth Amendment seizure of the person. *Ferris v. State,* 355 Md. at 379–81, 735 A.2d 491, analyzed the significance of this factor.

*Trooper Smith never informed Ferris that he was free to depart.* We recognize that the police are not required to inform citizens that they are free to leave before getting consent to search a motor vehicle. In *Ohio v. Robinette,* the Supreme Court rejected a *per se* constitutional requirement "that a lawfully seized defendant must be advised that he is 'free to go' before his consent to search will be recognized as voluntary." Nonetheless, the Court reiterated that " 'knowledge of the right to refuse consent is one factor to be taken into account' " in determining the voluntariness, and thus constitutional validity of a defendant's purported consent. Consequently, *an officer's failure to advise a motorist that he or she could refuse, or was free to leave, remains a factor to be considered.*

. . . .

... Trooper Smith was not obligated by the United States Constitution to advise Ferris that he was free to go, nonetheless *he ran the risk that his not doing so might imperil the constitutional validity of any further investigation.*

(Emphasis supplied). See also *Reynolds v. State,* 130 Md. App. at 340, 746 A.2d 422 ("Had appellant been advised that he was free to leave, as the detainee was so advised regarding the search in *Mendenhall,* there can be no doubt that he would not have remained.").

*United States v. Mendenhall,* 446 U.S. at 558–59, 100 S.Ct. 1870, also stressed the significance of this factor.

[I]t is especially significant that [Mendenhall] was twice expressly told that she was free to decline to consent to the search, and only thereafter explicitly consented to it. Although the Constitution does not require proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search, *such knowledge was highly relevant to the determination that there had been consent.* And, perhaps more important for present purposes, *the fact that the officers themselves informed [Mendenhall] that she was free to withhold her consent substantially lessened the probabili-*

*ty that their conduct could reasonably have appeared to her to be coercive.*

(Emphasis supplied).

*Ferris,* 355 Md. at 381 n. 8, 735 A.2d 491, quoted with approval from *State v. Robinette,* 80 Ohio St.3d 234, 685 N.E.2d 762, 771 (1997), a passage that has special relevance to the voluntariness of a consensual automobile search.

*If police wish to pursue a policy of searching vehicles* without probable cause or reasonably articulable facts, *the police should ensure that the detainee knows that he or she is free to refuse consent* despite the officer's request to search or risk that any fruits of any such search might be suppressed. While we are not mandating any bright-line test or magic words, *when a police officer informs a detainee that he or she does not have to answer further questions and is free to leave, that action would weigh persuasively in favor of the voluntariness of the consent to search.*

(Emphasis supplied).

In *Trott v. State,* 138 Md.App. 89, 111–12, 770 A.2d 1045 (2001), Judge Krauser noted for this Court that advising a suspect that he is free to leave, albeit a factor of less significance in more innocuous accostings, takes on greater significance in three situations, two of which are pertinent to the case before us.

As to the failure to advise appellant that he was free to leave, we note that *this factor has been cited as a consideration principally in three situations: (1) where police have requested the subject's consent to a search; (2) where police have asked the subject to change his or her location to facilitate questioning . . . .*

Obviously, none of these circumstances exist in the case *sub judice.* No request was made by the investigating officer in the instant case to search appellant nor did the officer request that he change his location. *. . . In each of these . . . instances, a police advisement was arguably warranted.* The right to decline a warrantless search of one's person or property is a fundamental right. A request

by police to accompany them to a more isolated or coercive setting is by its very nature suspect, unless of course the subject is advised he or she is free to go.

(Emphasis supplied).

### E. The Retention of Personal Property

 *Ferris,* 355 Md. at 377, 735 A.2d 491, describes one of the factors in distinguishing a consensual encounter from a detention as that of "whether the police retained the person's documents." In the context of a motorist having been stopped, such documents would probably be a driver's license and a registration card. In the context of stops in airports, such documents might include airline tickets, boarding cards, and passports. In *Florida v. Royer,* 460 U.S. at 503 n. 9, 103 S.Ct. 1319, the Supreme Court contrasted the mere accosting in *United States v. Mendenhall,* in which documents were immediately returned, with the Fourth Amendment detention in *Royer,* in which the documents were not returned.

> Here, Royer's ticket and identification remained in the possession of the officers throughout the encounter .... As a practical matter, Royer could not leave the airport without them. In Mendenhall, ... the ticket and identification were immediately returned, and the officers were careful to advise that the suspect could decline to be searched.

The Supreme Court pointed out that the police could have significantly sanitized the encounter in *Royer* by promptly returning Royer's personal property.

> We also think that the officers' conduct was more intrusive than necessary to effectuate an investigative detention otherwise authorized by the *Terry* line of cases. First, by returning his ticket and driver's license, and informing him that he was free to go if he so desired, the officers might have obviated any claim that the encounter was anything but a consensual matter from start to finish.

460 U.S. at 504, 103 S.Ct. 1319.

In this case, of course, no documents were involved, but Officer Talley's possession of the appellant's keys had the

same restraining effect on the appellant's freedom to leave the scene. The State argues that an indicium of the appellant's consent to the actual search of the car was his failure to voice any objection when Officer Talley proceeded from the trying of the key in the car door to the subsequent opening of the door and search of the interior. During that brief but critical time when the appellant might have voiced such an objection, however, his car keys remained in the possession of Officer Talley. That was an indicium that he was at that critical moment subject to detention and not free to leave, a status corrosive of the voluntariness of his non-objecting silence.

## F. Physical Contact

■ *Ferris*, 355 Md. at 377, 735 A.2d 491, refers to, in the alternative, "threatening behavior or physical contact." It is physical contact that concerns us in this case. *United States v. Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870, mentions as a significant factor "some physical touching of the person of the citizen."

Examples of *circumstances that might indicate a seizure,* even where the person did not attempt to leave, *would be ... some physical touching of the person of the citizen.*

(Emphasis supplied). See also *Jones v. State*, 319 Md. 279, 283, 572 A.2d 169 (1990); *Reynolds v. State*, 130 Md.App. 304, 342, 746 A.2d 422 (1999); *Rosenberg v. State*, 129 Md.App. 221, 241, 741 A.2d 533 (1999).

As we have already discussed and analyzed, exhaustively and perhaps exhaustingly, there was a very significant, and potentially dispositive, antecedent physical touching of the person of the appellant when Officer Talley frisked him for weapons.

## G. The Totality of the Circumstances

*Ferris*, 355 Md. at 384, 735 A.2d 491, concluded that, notwithstanding the polite tone of the officer and the ready compliance of the suspect, the totality of the circumstances

revealed a Fourth Amendment detention rather than a consensual accosting.

We emphasize that, although, standing alone, no single circumstance would have transformed the encounter into a Fourth Amendment seizure, the collective coerciveness of the totality of those circumstances rose to the level of a show of authority such that a reasonable person in Ferris's position would not have felt free to terminate the encounter with Trooper Smith at the moment the trooper asked him "if he would mind stepping to the back of his vehicle." Accordingly, we hold that Trooper Smith seized him within the meaning of the Fourth Amendment when he asked Ferris to get out of his car and began to question him about possible criminal activity . . . .

With respect to the apparent cordiality of the encounter in this case, we view it as did Judge Hollander in *Green v. State,* 145 Md.App. at 391, 802 A.2d 1130:

With respect to the Deputy's request at the end of the traffic stop to question appellant, Green said, "sure." He again responded "sure" as to the request to search. But, *a defendant's utterance of consensual words does not necessarily render a statement voluntary for Fourth Amendment purposes.* The statement must be considered in light of the circumstances.

(Emphasis supplied).

The hearing judge found the appellant's willingness to cooperate to have been a deliberate stratagem on his part to divert suspicion. That is a two-edged sword, for it also may indicate that the appellant believed himself to be in a clutch of circumstance where it was necessary to divert suspicion. One who is free to walk away would have no such need. In *Green v. State,* the cooperative suspect had gone so far as to ask a deputy sheriff if he would like to look in the trunk of the suspect's car. Judge Hollander discounted the significance of the behavior under the circumstances in which the suspect found himself.

The trial court considered it significant that Green asked Meil whether the deputy wanted to look in the trunk. ... Green's inquiry was consistent with *the cooperative conduct that he displayed,* but *does not signify that he believed he was free to terminate the encounter. Indeed, appellant's inquiry, a sign of his cooperation, may even have been a product of the coercive circumstances.*

*Green,* 145 Md.App. at 395, 802 A.2d 1130 (emphasis supplied).

The totality of the circumstances in this case yield the unavoidable conclusion that the appellant was subject to Fourth Amendment detention at the time when Officer Talley first took his keys from him and subsequently opened the car door and looked inside. The automobile search was not consensual and did not, therefore, satisfy the Fourth Amendment.

Indeed, from start to finish, the encounter in this case resembled a classic stop-and-frisk in every respect save only the lack of articulable suspicion. The label "field interview" cannot hide that irrepressible reality.

### The State's Last Gasp

 There is a suggestion that the appellant's disclaimer of the ownership of or any interest in his automobile should operate as a waiver of his right to object to the search of the car. Classically, such disclaimer-waiver arguments are couched in terms of a challenge to the defendant's standing to object.

On this issue, 5 Wayne R. LaFave, *Search and Seizure* (3d ed.1996), § 11.3(a), p. 128, is very clear.

Abandonment must be distinguished from *a mere disclaimer of a property interest made to the police prior to the search,* which under the better view *does not defeat standing.* Consider, for example, the facts of *Commonwealth v. Sandler.* The police inquired of Drew about the ownership or rental of certain premises where they suspected stolen property might be concealed, and he said he had rented the premises to Sandler. Later, *the police questioned Sandler, who denied renting the premises or storing*

*any property there,* after which the police searched those premises with the consent of Drew. The court quite correctly ruled that Sandler had standing to question the search, for *it can hardly be said that Fourth Amendment rights evaporate merely because of a failure to make incriminating admissions in response to police inquiries.*

(Emphasis supplied). See also *United States v. Morales,* 737 F.2d 761 (8th Cir.1984) (defendant's disclaimer to police that a certain hotel key was his did not constitute an abandonment of the room so as to deprive him of standing).

Fourth Amendment standing, moreover, is assessed in terms of what we know as actual historic fact in the courtroom at the time of the suppression hearing, not in terms of what the officer knew on the street at the time of the search.

### Conclusion

In the last analysis, the sheep's skin of a mere accosting will not cover the police actions in this case. Laid bare is the wolf of a true Fourth Amendment intrusion. The use of the wolf, of course, is not always forbidden and is sometimes a necessary part of good police work. Because of its attendant dangers, however, such use is circumscribed by stern Fourth Amendment safeguards. The necessary safeguards were not imposed in this case, and the evidence recovered in the course of the search of the appellant's automobile should, therefore, have been suppressed.

**JUDGMENT REVERSED; COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.**